**TRAILER MARINE TRANSPORT CORP., Plaintiff, Appellee,**

v.

**Carmen M. RIVERA VAZQUEZ, etc., et al., Defendants, Appellants.**

No. 91–2172.

United States Court of Appeals, First Circuit.

Heard June 1, 1992.

Decided Sept. 28, 1992.

Rehearing and Rehearing En Banc Denied Oct. 28, 1992.

**2**

Carlos Del Valle with whom Ramirez & Ramirez, Hato Rey, P.R., was on brief for defendants, appellants.

Nicolas Jimenez with whom Manuel San Juan and Jimenez, Graffam & Lausell, San Juan, P.R., were on brief for plaintiff, appellee.

Before SELYA, O'SCANNLAIN,* and BOUDIN, Circuit Judges.

BOUDIN, Circuit Judge.

Trailer Marine Transport Corp. ("Trailer Marine"), the plaintiff-appellee, brought suit in the district court to challenge the constitutionality of a motor vehicle fee as it applies to trailers used in transporting goods to and from Puerto Rico. The district court held that the Commerce Clause of the Constitution, art. I, § 8, cl. 3, does apply to legislation and administrative measures enacted or adopted by Puerto Rico. The district court further held that the fee as applied to such trailers violates the Commerce Clause. The agency and officials defending the fee, who are defendant-appellants in this case, appeal. We affirm.

### I. THE FACTS

Since 1968, Puerto Rico has had in force a compulsory, no-fault compensation plan to protect victims of motor vehicle accidents. Automobile Accident Social Protection Act, 9 L.P.R.A. § 2051 *et seq.* For anyone injured in a motor vehicle accident, the statute provides hospital and medical costs, and there are scheduled payments for death or disability. *Id.* § 2054. The

* Of the Ninth Circuit, sitting by designation.

plan supplants tort recovery up to the limits of the plan's benefits; above those limits a tort action is allowed. *Id.* § 2058. It is the fee charged to fund the plan that has given rise to this litigation.

A Puerto Rican governmental entity, the Automobile Accident Compensation Administration ("AACA"), administers the plan.[1] Under the statute, the AACA establishes a fee, subject to the approval of the Puerto Rico Commissioner of Insurance, to be paid annually by owners of motor vehicles. *Id.* § 2064. The fee in question is distinct from the ordinary annual charge made for a motor vehicle registration and license. The fee is designed to cover the cost of compensation paid through the plan and the cost of administering the plan. From 1974 to the present, with one important qualification described below, the fee has been set at a flat $35 per year for every motor vehicle registered in Puerto Rico regardless of type, frequency of use or other factors. In the case of tractor-trailer units, the means of much commerce on U.S. highways, Puerto Rico treats the tractor (which contains the operator cab and the engine) and the trailer (which carries the freight) as separate vehicles, each of which is subject to the fee.

Trailer Marine is one of a number of companies that is engaged as a common carrier in transporting goods to and from the island of Puerto Rico. The method it uses, known as "roll-on-roll-off," is to transport goods by tractor-trailer on the U.S. mainland to a port of embarkation; to load the trailer on a sea-going barge, leaving the tractor behind; to tow the barge by tug to the port of San Juan in Puerto Rico; and there to roll the trailer into a marshalling yard where it is hitched to a local tractor for delivery within Puerto Rico. The trailers, which may stay in Puerto Rico for only a few days or for a longer period, ultimately make the reverse voyage back to the mainland in the same manner. In 1990, Trailer Marine transported over 100,-000 trailers to Puerto Rico.

One other carrier, The Puerto Rico Maritime Shipping Authority, uses the roll-on-roll-off method of transporting trailers, although it carried only about 30 percent of its freight in this fashion at the outset of this case and is said to be reducing further its use of this method. All other carriers engaged in delivering trailer freight to Puerto Rico use a method known as "lift-on-lift-off." In this process, the freight-carrying "container" section of the trailer is separated, typically at the port of embarkation, from the chassis section comprising the wheels, trailer bed, and other apparatus. The container is lifted by crane into a ship, transported to Puerto Rico, and there lifted off by crane and deposited onto a waiting local chassis. The recombined container and chassis are then hitched to a local tractor for delivery, after which the process is reversed to send the container back to the mainland.

Payment of the annual fee required by the Puerto Rican accident-compensation statute is normally made when the owner obtains or renews registration for the motor vehicle in Puerto Rico. The trailers hauled by Trailer Marine are virtually all registered in individual states rather than in Puerto Rico, but during the period 1968–1984, it appears that Trailer Marine obtained each year a block of 300 to 500 trailer registrations and license plates from the Puerto Rican authorities, paying at the same time the compensation plan fee for each registration. Trailer Marine then affixed a license plate to each incoming trailer, leaving it there during the trailer's stay in Puerto Rico and removing it when the trailer left (in order to affix it to a newly entering trailer). Whether this was a voluntary gesture by Trailer Marine or an evasion of Puerto Rican law, the fact is that in 1983 or 1984, the authorities in Puerto Rico declined to issue any more license plates to Trailer Marine for transfer from one trailer to another.

Instead, the AACA sought legislation in Puerto Rico directed at the so-called "transitory" trailers utilized by Trailer Marine,

---

**1.** AACA and certain of its officials were the defendants in the district court and, for convenience, we here refer to them together as "AACA."

as well as by the Puerto Rico Maritime Shipping Authority. The outcome of this effort were two companion laws, Laws No. 26 and 27, enacted December 12, 1989. 9 L.P.R.A. § 2064(2); 9 L.P.R.A. § 541, 1852. Law No. 26, which is the subject of this case, amended the 1968 compensation statute for the express purpose of establishing fees for transitory trailers under the accident-compensation statute. The companion amendment, Law No. 27, explicitly obligated transitory trailers to register and pay Puerto Rico an annual fee for registration and licensing. Law No. 26 effectively imposes the compensation plan fee—currently $35 a year—on each transitory trailer, subject to one exception: in lieu of the annual fee, the company responsible for the transitory trailer may instead opt to pay a special premium in an amount fixed by the AACA board of directors and approved by the Commissioner of Insurance. 9 L.P.R.A. § 2064.

In February 1990, the AACA board of directors set, and the Commissioner of Insurance approved, the special transitory-trailer fee called for by Law No. 26. The amount was set at $15, which is payable on the entry to Puerto Rico of a transitory trailer and is to be paid for each entry unless and until the trailer operator chooses to pay the annual $35 fee for the trailer. The $15 fee entitles the trailer to remain in Puerto Rico for up to 30 days; if the trailer overstays this period, the full $35 annual fee must be paid (with no reduction on account of a prior $15 payment). A somewhat different option and process was enacted by Law No. 27 for payment of the registration and license fee by transitory trailers, but with that statute we are not directly concerned.

Calculating that the fees payable under Laws No. 26 and 27 would cost it several million dollars a year, Trailer Marine filed two suits in the district court on March 14, 1990, challenging these statutes on constitutional grounds. On March 22, 1990, the district court denied a temporary restraining order, *Trailer Marine Transport Corp. v. Ortiz*, 733 F.Supp. 490 (D.P.R. 1990), and on October 25, 1990, the district court dismissed the challenge to Law No. 26 on *Burford* abstention grounds. *Trailer Marine Transport Corp. v. Rivera Vazquez*, 749 F.Supp. 376 (D.P.R.1990), *vacated*, 931 F.2d 961 (1st Cir.1991). On appeal, this court reversed the latter order and remanded, holding that the *Burford* doctrine did not bar the claims in this case.[2]

On remand, the district court received cross-motions for summary judgment, buttressed by discovery, addressed to the claim that Law No. 26 was unconstitutional under the Commerce Clause. In an unpublished opinion, the district court on September 25, 1991, held that the fee on transient trailers did violate the dormant Commerce Clause doctrine and was invalid. The district court determined that the fee had no demonstrated connection to the harm caused by transient trailers, discriminated against them in favor of shippers using lift-on-lift-off containers, and unduly burdened and discriminated against interstate commerce both in purpose and effect. This appeal followed.

## II. DISCUSSION

This case, which might have been contrived as an examination essay, presents four issues which we discuss in turn: the potential role of the Tax Injunction and Butler Acts; the applicability of the dormant Commerce Clause doctrine to Puerto Rico; the validity of the Puerto Rico fee structure for transitory trailers under the Commerce Clause; and the possible impact of the McCarran–Ferguson Act to shield any constitutional violation.

### A. *Jurisdiction*

The threshold question is whether the statutory ban limiting injunctions against tax collection, which precluded the

---

**2.** The challenge to Law No. 27, imposing the special registration and license fee on transient trailers, was dismissed by the district court on the ground that it involved an attack on a state tax, a course prohibited by the Butler Act, 48 U.S.C. § 872. *See also* Tax Injunction Act, 28 U.S.C. § 1341. *Trailer Marine*, 733 F.Supp. at 493–94. Trailer Marine has not appealed that dismissal, choosing instead to pursue its local remedies to challenge Law No. 27.

challenge to Law No. 27, also precludes the present suit. The issue was apparently not raised by AACA in the district court or in this court, and we discuss the point solely because the bar in question is deemed "jurisdictional" and is not subject to waiver. *See California v. Grace Brethren Church,* 457 U.S. 393, 418–19, 102 S.Ct. 2498, 2513, 73 L.Ed.2d 93 (1982). The Tax Injunction Act of 1937, 28 U.S.C. § 1341, prevents district courts, with an exception not here invoked, from enjoining collection of "any tax under State law" and this bar extends equally to declaratory relief. *Grace Brethren Church,* 457 U.S. at 408, 102 S.Ct. at 2507. Whether or not Puerto Rico is a "state" for this purpose does not matter because the Butler Act, 48 U.S.C. § 872, independently prohibits the district court from entertaining a suit to restrain collection of "any tax imposed by the laws of Puerto Rico...." Despite slightly different wording, the two statutes have been construed *in pari materia. See, Parker v. Agosto–Alicea,* 878 F.2d 557, 559 (1st Cir. 1989).

■■■ A leading treatise affirms that "[t]he courts have had little difficulty in determining what is a 'tax'" under the 1937 anti-injunction statute, 17 C. Wright & A. Miller & E. Cooper, *Federal Practice and Procedure* § 4237 at 644 (2d ed. 1988), but that may be an optimistic reading of the cases. The problem is that the decisions have applied the label "tax" in this context to a range of exactions that might not be commonly described as taxes, including contributions for unemployment compensation, *Sipe v. Amerada Hess Corp.,* 689 F.2d 396, 402–03 (3d Cir.1982), fees imposed on litigants seeking jury trials, *Butler v. Maine Supreme Judicial Court,* 767 F.Supp. 17, 19 (D.Me.1991), and payments by parolees to cover supervision costs and compensate victims. *Wright v. McClain,* 835 F.2d 143, 145 (6th Cir.1987). Puerto Rico's decision to call the fee a "contribution" or "premium," 9 L.P.R.A. § 2064, rather than a "tax" may be pertinent but does not decide the matter, for it is federal law that determines what constitutes a tax for this purpose. *Robinson Protective Alarm Co. v. City of Philadel-*

*phia,* 581 F.2d 371, 374 (3d Cir.1978); *Crane v. Comm'r of Dep't of Agric., Food & Rural Resources,* 602 F.Supp. 280, 282 n. 3 (D.Me.1985).

The most common formula for classifying exactions under the Tax Injunction Act—asking whether the payment is a tax to raise general revenue or is a fee incident to regulation, *see, e.g., San Juan Cellular Tel. Co. v. Public Service Comm'n of Puerto Rico,* 967 F.2d 683 (1st Cir.1992); *Butler,* 767 F.Supp. at 19 (collecting cases)—is often useful but does not provide much help in this case. In truth, the purpose of the fee here in issue is neither to raise general revenue for Puerto Rico nor to regulate conduct in the usual sense of that term. The accident-compensation statute is essentially a social welfare program and tort reform law to impose on motor vehicle owners as a class the cost of the accidents they cause and to assure compensation for accident victims.

In construing the Tax Injunction Act, the Supreme Court has attributed to Congress a central purpose to protect tax collection as an "imperative need" of government, *Tully v. Griffin, Inc.,* 429 U.S. 68, 73, 97 S.Ct. 219, 222, 50 L.Ed.2d 227 (1976), for as the Court has elsewhere explained, "taxes are the life-blood of government...." *Perez v. Ledesma,* 401 U.S. 82, 127 n. 17, 91 S.Ct. 674, 698 n. 17, 27 L.Ed.2d 701 (1971) (separate opinion of Brennan, J., quoting the statement in *Bull v. United States,* 295 U.S. 247, 259–60, 55 S.Ct. 695, 699, 79 L.Ed. 1421 (1935)). *See also* 26 U.S.C. § 7421 (limiting injunctions against federal tax collection). This broad purpose does not cleanly resolve a case, like this one, where the legislature does not call the measure a tax and the money is collected largely as dedicated transfer payments for the beneficiaries. However, this court has described the "classic tax" as one that "raises money [from "many, or all, citizens"], [is] contributed to a general fund, and [is] spent for the benefit of the entire community" and has distinguished fees dedicated to provide "narrow benefits" or to defray an agency's costs of regulation. *San Juan Cellular,* 967 F.2d at 685.

On balance we believe, as the AACA concedes by its silence, that the fee involved should not be treated as a tax for purposes of the Butler and Tax Injunction Acts. This conclusion in our view is supported by several factors, including the fact that the fees paid are held separately from general state funds, they are dedicated exclusively to reimburse private parties and to cover AACA's administrative expenses, they are collected only from those seeking the privilege of driving on state highways, and they are proportioned (for motor vehicles as a class) to compensate victims for specified damage resulting from that activity. While this may be regarded as a close issue, we are at least confident that allowing an injunction suit to be maintained poses no threat to the central stream of tax revenue relied on by Puerto Rico.

### B. *Application of the Commerce Clause to Puerto Rico*

The second question in this case, surely the most important of those presented, is whether and how the Commerce Clause constrains legislation and administrative action of Puerto Rico. Trailer Marine argues that the fee imposed on transient trailers violates the dormant Commerce Clause, the doctrine that state or local government action is invalidated by the Commerce Clause by its own force where such action unduly burdens or discriminates against interstate commerce. *See, e.g., Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). Trailer Marine says that AACA waived in the district court its present claim that the Commerce Clause does not apply to Puerto Rico. We conclude that the issue has been properly preserved for consideration by this court.

■ AACA admits that it did not raise the issue in its district court pleadings but asserts that whether the Commerce Clause applies to Puerto Rico is a jurisdictional issue that this court may, indeed must, notice at any time. The issue is not jurisdictional. Given a colorable claim, the fed-

eral courts have authority to entertain a suit to restrain constitutional violations. *See Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). The coverage of the Commerce Clause vis-a-vis Puerto Rico is as much a "merits" issue as the application of the Commerce Clause to a specific fee, and there is nothing to prevent a waiver by AACA of either issue.

■ Nevertheless, in this case the district court itself explicitly held, at the hearing on Trailer Marine's request for a temporary restraining order, that "[t]his District has held that the Interstate Commerce Clause, in its dormant state, fully governs the trade relations between Puerto Rico and the United States." *Trailer Marine,* 733 F.Supp. at 495. In the present case, where the district court expressly and unequivocally addressed the issue at the outset, we see no reason why AACA needed to reassert its contention formally to preserve it for review.

■ Any doubt on this point is readily resolved in favor of considering the issue. This case concerns an ongoing injunction, constraining part of a governmental program, based on the premise that the Commerce Clause applies to Puerto Rico. The premise presents a clean-cut legal issue of continuing importance for Puerto Rico that can be addressed without remand. Even if the issue had not been resolved by the district court, this court would have the authority to decide it and considerable incentive to do so. *See Landol–Rivera v. Cruz Cosme,* 906 F.2d 791, 792 (1st Cir. 1990) (considering question not raised below because it "concerns the very premise of plaintiff's claim ... and because any perceived legitimation of that premise would be fraught with mischief").

Turning to the question whether Puerto Rico is covered by the dormant Commerce Clause doctrine, the framework is furnished by Puerto Rico's constitutional history, a skein of statutes and precedents as tangled as any in our history. Puerto Rico was acquired by the United States from Spain in 1898 by the Treaty of Paris and became subject to Congress' plenary authority under the Territorial Clause of the

Constitution. U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to ... make all needful Rules and Regulations respecting the Territory ... belonging to the United States."). Then, over a half century, Puerto Rico's autonomy increased in stages, its relationship with the federal government being governed successively by the original Foraker Act, 31 Stat. 77 (1900); then by the Organic Act of 1917, also known as the Jones Act, 39 Stat. 951 (1917); and finally by federal statutes in 1950 and 1952 that established Puerto Rico's present status in accordance with the legislation, a referendum and ultimately a Puerto Rican Constitution approved by the people of Puerto Rico and by Congress. *See Cordova & Simonpietri Ins. Co. v. Chase Manhattan Bank, N.A.,* 649 F.2d 36, 38–39 (1st Cir.1981); Puerto Rican Federal Relations Act, 48 U.S.C. § 731 *et seq.*

Today, the government of the Commonwealth of Puerto Rico in many respects resembles that of a state. It has an elected governor and legislature, and its legislature has powers akin to those exercised by the states. *See* 48 U.S.C. § 821. Puerto Rico has immunity to suit in common with state governments. *Alcoa Steamship Co. v. Perez,* 424 F.2d 433, 435 (1st Cir.1970). Except for various tax code provisions and certain other exceptions, federal statutes apply in Puerto Rico, as they do in any state, unless otherwise provided. 48 U.S.C. § 734. Citizens of Puerto Rico, like citizens of the states, are citizens of the United States. 8 U.S.C. § 1402. The United States guarantees Puerto Rico a republican form of government and Puerto Rico is bound to respect the rights, privileges and immunities of all citizens. 48 U.S.C. §§ 731, 737. *Compare* U.S. Const. art. IV, § 4; amend. XIV, § 1.

Nevertheless, under the 1950 and 1952 legislation "the status of the Commonwealth of Puerto Rico is still not the same as that of a State in the Federal Union, though both have in common complete powers of local self-government." Magruder, *The Commonwealth Status of Puerto Rico,* 15 U.Pitt.L.Rev. 1, 19 (1953) (footnote omitted). Puerto Rico is not formally a state, has no Senators and no voting representation in the House, and in certain respects it has been treated differently than states by the courts. For example, under governing Supreme Court precedent, Congress may, and sometimes has, enacted laws that make different provision for Puerto Rico than for the states, limited only by a rational basis requirement. *Harris v. Rosario,* 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980). While fundamental constitutional rights are protected in Puerto Rico, not all federal constitutional rights have been held to apply in Puerto Rico, *see Balzac v. Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922) (right to jury trial), and the Court has declined to decide whether Puerto Rico is governed by the Fifth or by the Fourteenth Amendment. *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 7–8 n. 6, 102 S.Ct. 2194, 2199 n. 6, 72 L.Ed.2d 628 (1982). In sum, Puerto Rico's status is unique. *Examining Bd. v. Flores de Otero,* 426 U.S. 572, 596, 96 S.Ct. 2264, 2278, 49 L.Ed.2d 65 (1976).

▪ Against this background, we conclude that Puerto Rico is subject to the constraints of the dormant Commerce Clause doctrine in the same fashion as the states. Our reasoning does not rest on a bare analogy between Puerto Rico and individual states, for the analogy has much force but also—as we have just seen—some limitations. Rather our conclusion derives from reasoning specific to the Commerce Clause as applied to Puerto Rico's current circumstances.

The Commerce Clause, of course, is one of the great founts of Congressional authority. Based on longstanding case law, there can be no doubt that this grant of power to Congress to "regulate Commerce with foreign Nations and among the several States," U.S. Const. art. I, § 8, cl. 3, subsumes the power to regulate trade between Puerto Rico and individual states (or foreign countries).[3] Yet nothing in the

---

3. Both the Supreme Court and this court have long held or assumed that Congress has power under the Commerce Clause to regulate commerce with Puerto Rico. *See Secretary of Agric.*

Commerce Clause expressly provides that the mere grant of power to Congress excludes or delimits the power of a state or any other entity to regulate such commerce. This gap is what Justice Jackson described as one the "great silences" of the Constitution. *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 534–35, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949).

The Supreme Court has resolved this silence by holding that the power granted Congress under the Commerce Clause is not invariably exclusive of the states but only sometimes so. *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852). Pertinently, the Court's decisions hold, in an application that is opaquely called the dormant Commerce Clause, that state laws or local regulations are invalid under the Commerce Clause *ex proprio vigore* where they unduly burden or discriminate against interstate or foreign commerce. *City of Philadelphia v. New Jersey,* 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978).

The central rationale of this dormant Commerce Clause doctrine, as the Supreme Court has explained, is the dominant purpose of the Commerce Clause to foster economic integration and prevent local interference with the flow of the nation's commerce. *Du Mond,* 336 U.S. at 537–38, 69 S.Ct. at 664–65. This rationale applies with equal force to official actions of Puerto Rico. Full economic integration is as important to Puerto Rico as to any state in the Union. In a different context, the Supreme Court has flatly rejected the notion that Puerto Rico may erect an "intermediate boundary" separating it from the rest of the country. *Torres v. Puerto Rico,* 442 U.S. 465, 472, 99 S.Ct. 2425, 2430, 61

L.Ed.2d 1 (1979). There is no reason to believe that Congress intended to authorize Puerto Rico to restrict or discriminate against cross-border trade and ample reason to believe otherwise. *E.g.,* 48 U.S.C. § 738 (no duties may be imposed on trade between Puerto Rico and the United States); 48 U.S.C. § 741a (Puerto Rico can tax imported goods but cannot discriminate in favor of goods made in Puerto Rico).[4]

If the government of Puerto Rico were nothing other than the alter ego or immediate servant of the federal government, then the dormant Commerce Clause doctrine would have no pertinence, for a doctrine designed to safeguard federal authority against usurpation has no role when the federal government itself is effectively the actor. *Cf. Sakamoto v. Duty Free Shoppers, Ltd.,* 764 F.2d 1285, 1286 (9th Cir. 1985) (government of Guam "an instrumentality" of the federal government), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1457, 89 L.Ed.2d 715 (1986); *United States v. Husband R. (Roach),* 453 F.2d 1054, 1059 (5th Cir.1971) (Canal Zone governor an "agent" and "delegate" of Congress), *cert. denied,* 406 U.S. 935, 92 S.Ct. 1785, 32 L.Ed.2d 136 (1972). Whatever the ultimate source of its authority or its exact constitutional status, Puerto Rico today certainly has sufficient actual autonomy to justify treating it as a public entity distinct from Congress and subject to the dormant Commerce Clause doctrine. In the Supreme Court's words, "the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union...." *Examining Board v. Flores de Otero,* 426 U.S. 572, 594, 96 S.Ct.

---

*v. Central Roig Refining Co.,* 338 U.S. 604, 616, 70 S.Ct. 403, 409, 94 L.Ed. 381 (1950) (Sugar Act of 1948 applied to Puerto Rico through the Commerce Clause); *Puerto Rico Tel. Co. v. FCC,* 553 F.2d 694, 701 (1st Cir.1977) (Federal Communications Commission regulations applied via the Commerce Clause to government-owned telephone company in Puerto Rico). Thus, in one aspect, the question "whether the Commerce Clause applies to Puerto Rico" has been settled in the affirmative for many years; the more precise issue, posed in this case, is wheth-

er the dormant Commerce Clause doctrine also applies to Puerto Rico.

**4.** If these provisions had been recently enacted, they might suggest some doubt—on the part of Congress—as to whether the dormant Commerce Clause doctrine applied to Puerto Rico. In fact they were enacted in 1900 and 1917, respectively, and so create no inference relevant to present-day conditions (although we note that in any event the constitutional issue would be for the courts to decide).

2264, 2277, 49 L.Ed.2d 65 (1976). *See also Cordova,* 649 F.2d at 40–41.

We are reinforced in this conclusion by precedents in other circuits applying the dormant Commerce Clause doctrine to the then territorial government of Alaska, *Anderson v. Mullaney,* 191 F.2d 123, 127 (9th Cir.1951), *aff'd,* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952), and to the present territorial government of the Virgin Islands. *JDS Realty Corp. v. Government of Virgin Islands,* 824 F.2d 256, 259–60 (3rd Cir.1987), *vacated on other grounds,* 484 U.S. 999, 108 S.Ct. 687, 98 L.Ed.2d 640 (1988), *dismissed on remand,* 852 F.2d 66 (3rd Cir.1988). Similarly, even before the lower court's action in this case, the district court in Puerto Rico had held the dormant Commerce Clause doctrine to apply in Puerto Rico, *e.g., Sea–Land Services, Inc. v. Municipality of San Juan,* 505 F.Supp. 533, 545 (D.P.R.1980), although the Supreme Court of Puerto Rico has taken a different view. *RCA Communications, Inc. v. Government of the Capital,* 91 D.P.R. 404 (1964), relying in part on a prior statement by this court in *Buscaglia v. Ballester,* 162 F.2d 805 (1st Cir.), *cert. denied,* 332 U.S. 816, 68 S.Ct. 154, 92 L.Ed. 393 (1947).

Understandably, *Buscaglia* is urged by AACA to support its claim that the dormant Commerce Clause doctrine does not apply to Puerto Rico. That case involved a taxpayer's claim that it was a forbidden regulation of interstate commerce for Puerto Rico to apply its personal property tax to merchandise being imported into Puerto Rico. Sustaining the tax, this court in very brief discussion, *id.* at 807, accepted the view that the Commerce Clause did not by itself limit the power of the Puerto Rican territorial legislature, noting that Congress retained plenary power over such legislation even to the extent of annulling local laws. *See* 48 U.S.C. § 821 (1946) (repealed as of 1952). This ruling was at best an alternative holding since the court went on

at greater length to find that Congress had authorized the territorial legislature to impose the tax, *id.* at 808, a determination that would have saved the statute even if the dormant Commerce Clause doctrine had otherwise applied. *Lewis v. B.T. Inv. Managers, Inc.,* 447 U.S. 27, 44, 100 S.Ct. 2009, 2019, 64 L.Ed.2d 702 (1980). Still, the Commerce Clause holding was explicit and should not be lightly passed over.

We think that the force of the reasoning in *Buscaglia* has been sapped by events since that decision. However the matter may have appeared in 1947, certainly since 1952 Puerto Rico has had sufficient effective autonomy to classify it as something more than the mere agent of Congress and thus bring it within the dormant Commerce Clause doctrine. There is no need to decide whether *Buscaglia* would be reaffirmed if circumstances had remained unaltered, *compare JDS Realty,* 824 F.2d at 260 (criticizing *Buscaglia* ), for those circumstances have unquestionably changed. Indeed, in *Caribtow Corp. v. Occupational Safety & Health Review Comm'n,* 493 F.2d 1064 (1st Cir.), *cert. denied,* 419 U.S. 830, 95 S.Ct. 52, 42 L.Ed.2d 55 (1974), we took note of the intervening changes but said that we had "no occasion here to reconsider that opinion [in *Buscaglia* ] in the light of intervening events," referring to the 1952 change of status. *Id.* at 1068 n. 11. Today we have that occasion and hold that *Buscaglia* will no longer be followed.[5]

## C. *The Validity of the Fee*

We turn now to the merits. The precedents determining when a state law or regulation violates the dormant Commerce Clause doctrine are peculiarly murky but we are guided here by a Supreme Court precedent, *American Trucking Ass'ns v. Scheiner,* 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987), that is little short of controlling.

---

5. Following the procedure described in *Gallagher v. Wilton Enterprises, Inc.,* 962 F.2d 120, 124 n. 4 (1st Cir.1992), the proposed panel opinion in this case was circulated to all active judges of the court prior to publication, and none posed an objection to the panel's treatment

of *Buscaglia.* This procedure, needless to say, does not convert this opinion into an *en banc* decision nor preclude a suggestion of rehearing *en banc* on any issue in the case, whether or not related to the panel's treatment of *Buscaglia.*

■ Formulas for applying the dormant Commerce Clause are, if flexible enough to be valid, usually too general to resolve concrete cases. Still, the formulas offer a starting point and, under the precedents, state action that "discriminates against interstate commerce" stands condemned. *See Fort Gratiot Sanitary Landfill v. Michigan Dep't of Natural Resources,* — U.S. —, — – —, 112 S.Ct. 2019, 2023–2024, 119 L.Ed.2d 139 (1992); L. Tribe, *American Constitutional Law* 408, 442 (2d ed. 1988). To be sure, the quoted phrase is not self-executing. But a regulation, tax or other constraint that disproportionately impairs or disfavors out-of-state commerce or cross-border transactions is highly suspect, if not presumptively invalid. *See Chemical Waste Management, Inc. v. Hunt,* — U.S. —, —, 112 S.Ct. 2009, 2014, 119 L.Ed.2d 121 (1992); *Hughes v. Oklahoma,* 441 U.S. 322, 337, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979); *City of Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535.

■ Forbidden discrimination may be facial, *e.g., Kraft General Foods v. Iowa Dep't of Revenue,* — U.S. —, —, 112 S.Ct. 2365, 2371, 120 L.Ed.2d 59 (1992) (differential taxation of dividends from foreign subsidiaries), but it may also infect a regulation or tax that is neutral on its face but discriminatory in operation or effect. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (requirement that fruit be packaged in state of origin to avoid misrepresentation of product quality). In deciding whether discrimination exists, the Supreme Court has not shown states the deference normally afforded them in matters of economic regulation. The Court's more searching scrutiny is said to reflect the importance of the national interest in a unified economy, the lack of power of affected non-residents of the state to protect themselves through the state's political process, and the ability of Congress (by express authorization) readily to undo any mischief worked by the courts. *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 767–68 n. 2, 65 S.Ct. 1515, 1519–20 n. 2, 89 L.Ed. 1915 (1945); Tribe, *supra,* at 409–10.

Deciding under the Commerce Clause precedents whether discrimination exists is heavily dependent upon the facts. *See Scheiner,* 483 U.S. at 271–75, 107 S.Ct. at 2833–35. This case, like *Scheiner,* involves a flat fee imposed on motor vehicles—there trucks and here all classes of motor vehicles including trailers. In sum, Puerto Rico charges each vehicle including trailers $35 per year as a contribution to the accident compensation fund, offering an optional reduction to $15 for those trailers that remain in Puerto Rico for 30 days or less. Although Trailer Marine describes this fee structure as discriminatory on its face, it seems to us to be at least facially neutral—a flat $35 per vehicle fee tempered by an optional reduction favoring transient trailers. Despite this option the fee is clearly discriminatory in impact.

■ Under this fee structure a transient trailer, like those of Trailer Marine, pays the same flat fee as local trailers (or, if expected to stay 30 days or less, just under half of the ordinary flat fee) even though the transient trailers are presumptively going to cause far fewer accidents and impose far lower costs on the compensation fund than locally based trailers. The word "presumptive" has to be used in the absence of firm statistics; but the inference is so compelling that only the amount of the discrimination, and not its fact, can be plausibly contested. A transitory trailer that stays only 30 days in Puerto Rico, and so qualifies for the $15 fee, is likely on average (other things being equal) to cause only $\frac{1}{12}$th as many accidents as a trailer that is based in Puerto Rico twelve months a year. Yet the transient trailer pays almost half the ordinary flat fee, effectively paying five or six times as much per accident. For longer-staying transient trailers only the amount of the discrimination differs.[6] The differential may seem

---

6. Of course, "other things" are almost never equal in such cases, and a transitory trailer might well travel more miles per day in Puerto Rico, and so cause more accidents per day, than a local trailer. But no showing of this kind appears to have been made by AACA. By con-

small for an individual trailer but the cumulative disparity is ample where, as here, Trailer Marine imports 100,000 or more trailers each year. Trailer Marine's evidence suggested that the impact involved millions of dollars each year. Without endorsing any specific figure, we are confident that the sum cannot be brushed aside as incidental. It does not matter whether the discrimination would actually force Trailer Marine from the market or prevent certain goods from reaching Puerto Rico, although Trailer Marine offered evidence on both points. Once a state regulation or tax is found to *discriminate* against interstate commerce, it is presumptively invalid, *New Energy Co. v. Limbach*, 486 U.S. 269, 276–77, 108 S.Ct. 1803, 1808–1809, 100 L.Ed.2d 302 (1988), and the only remaining question is possible justification. *Compare Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978) (statute did not discriminate among similarly situated in-state and out-of-state companies).

Before considering that issue, it is fruitful to address now the only Supreme Court precedent almost directly on point, *American Trucking Ass'ns v. Scheiner*. In *Scheiner*, the Supreme Court reviewed two flat taxes imposed by Pennsylvania on trucks, and the Court assumed *arguendo* (although the point was disputed by the truckers) that the same dollar amount was paid each year whether the truck was based in Pennsylvania or merely entered Pennsylvania from time to time. The Supreme Court found from the evidence, as is intuitively obvious, that on average the flat taxes represented a much higher per mile charge on out-of-state trucks than on Pennsylvania trucks for miles traveled in Pennsylvania. "In practical effect," said the Court, "since they [the flat taxes] impose a cost per mile on appellants' [out of state] trucks that is approximately five times as heavy as the cost per mile borne by local trucks, the taxes are plainly discriminatory." *Id.* 483 U.S. at 286, 107 S.Ct. at 2841 (footnote omitted).

*Scheiner* is closely in point, and completely controls this case on the issue of discrimination, with one possible qualification. In *Scheiner*, as in many Commerce Clause cases, the flat tax gave a competitive edge to in-state businesses who might be direct rivals of the disfavored out-of-state businesses. In this case, by contrast, the immediate rivals of Trailer Marine are the lift-on-lift-off shipping companies, who are equally favored by the fee structure whether based outside or inside of Puerto Rico. Indeed, AACA tries to counter the charge of discrimination by pointing out that the other victim of its fee structure is the Puerto Rico Maritime Authority, which used the roll-on-roll-off method for some of its transport and may still do so.

This comparison, looking to the locations of direct business rivals, is too narrow. The fee structure at issue does discriminate against out-of-state businesses who use out-of-state trailers to serve Puerto Rico by charging them what is in effect a substantially higher charge for the use of Puerto Rico's roads than is charged to local businesses who use Puerto Rico based trailers solely within Puerto Rico. In substance, the cost of paying for trailer accidents in Puerto Rico is borne disproportionately by out-of-state transient trailers. As the earlier example indicated, a Trailer Marine trailer that stays in Puerto Rico just under 30 days pays $15 while a Puerto Rico based trailer that plies Puerto Rico's roads for 12 months pays $35; absent other evidence, it is fair to infer that the former is paying for accidents at a rate between five and six times higher than the domestic trailer. Such an imbalance in favor of local interests (here local trailers) over similarly situated non-resident interests (transitory trailers) is a proper concern of the Commerce Clause whether or not the market participants are direct business rivals. *E.g.*, *Kraft Gen. Foods v. Iowa Dep't of Revenue*, —— U.S. ——, 112 S.Ct. 2365, 120 L.Ed.2d 59 (1992).

Under *Scheiner* and many prior cases, it is evident that a discrimination however

---

trast, Trailer Marine offered direct evidence that the average stay of its trailers was only seven days, which would greatly worsen the discrimination against it.

clearly established can in some cases be justified, although the burden to do so falls on the defender. AACA begins with the general proposition that the accident compensation law relates to health and safety and that Commerce Clause cases show a special solicitude for such statutes. This solicitude is ordinarily shown to statutes that regulate behavior such that less stringent standards mean less safety or less of some other social good. *E.g., Maine v. Taylor,* 477 U.S. 131, 151–52, 106 S.Ct. 2440, 2454, 91 L.Ed.2d 110 (1986). In this case, the funds raised from motor vehicles for victims serve a legitimate health and welfare purpose, but the precise state practice at issue is the fee structure for raising those funds. The fee structure can be adjusted to avoid the discrimination without in any way impairing compensation for victims.

AACA next claims that its fee structure is "rational" in light of the greater harm caused by trailers in highway accidents than by ordinary cars. In adopting the fee structure under Law No. 26, AACA obtained actuarial evidence, of a sort, suggesting that "the proper relativity of tractor trailer loss costs to private passenger loss costs is between 7 and 10," or, in simple translation, these trailers incur greater liability than cars. Assuming (as may well be the case) that tractor-trailers impose greater costs on the compensation fund because they cause more accidents per mile than cars, do more harm per accident, or both, a greater fee for them than for cars could readily be justified from the standpoint of the Commerce Clause. But such an increased charge would have to be imposed as well on trailers that operate solely in Puerto Rico, and there would still have to be an appropriate differential between transient trailers that stay only a part of the year and local trailers that remain all year long.[7]

Finally, this case might well have a different ending if Puerto Rico could show that its current fee structure was "the only practicable means" of collecting contributions from transitory trailers. *Scheiner,* 483 U.S. at 296, 107 S.Ct. at 2846. *See also Capitol Greyhound Lines v. Brice,* 339 U.S. 542, 546, 70 S.Ct. 806, 808, 94 L.Ed. 1053 (1950). But as *Scheiner* itself demonstrates, "only practicable means" is a more demanding standard than mere administrative convenience or reduced collection costs. If Puerto Rico (unlike Pennsylvania, *see Scheiner,* 483 U.S. at 273, 107 S.Ct. at 2834) finds it infeasible to place its fee on a mileage basis, it could certainly permit a transfer of the certificate or other insignia of payment (of the full $35 fee) from an outgoing transient trailer of Trailer Marine to an incoming one, providing a rough equivalence between a group of Trailer Marine trailers and a single full-time trailer based in Puerto Rico. AACA has fallen far short of demonstrating that it has no practicable means, other than by discrimination, of collecting a contribution from transient trailers.

### D. The McCarran–Ferguson Exemption

■ AACA's last argument, generously construed, is that the McCarran–Ferguson exemption shields any discrimination that might otherwise be found to infect its fee structure. The McCarran–Ferguson Act, 15 U.S.C. §§ 1011–15, provides that the "business of insurance" is subject to state regulation and taxation, *id.* § 1012, and Puerto Rico is defined as a state for this purpose. *Id.* § 1015. Although the statute does not say so in terms, it has been read, where applicable, to negate the dormant Commerce Clause doctrine for state regulation of the "business of insurance" and, perhaps surprisingly, to do so even when the state's action is discriminatory. *Western & Southern Life Ins. Co. v. State Bd.*

---

7. An advisor to AACA told it that the fee had to cover the administrative cost of collecting the fee and opined that the fee should be at least $10 to provide a contribution to the compensation fund over and above the cost of collection. There is no evidence from AACA, however, that it costs anything like $10 to collect the fee from transient trailers, or that $5 is their just contribution to the fund. There is direct evidence that Puerto Rico's collection cost for the transitory trailer fee is largely that of cashing large checks from Trailer Marine.

*of Equalization*, 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981).

■ The pertinent question, therefore, is whether Puerto Rico's accident compensation law, and more specifically the setting of the fees to fund it, should be viewed as the "business of insurance" within the meaning of the McCarran–Ferguson Act. On this issue, the nomenclature used in Puerto Rico's statute is not consistent but neither is it decisive. The statute in one section does speak of "the cost of this insurance" and the "premium" owing, 9 L.P.R.A. § 2064(1), (3), and the Puerto Rico Insurance Commissioner must "approve" the fee set by the AACA, 9 L.P.R.A. § 2064(3), although the local insurance code generally excepts the AACA from its operation. 26 L.P.R.A. § 107. By contrast, the Puerto Rico Supreme Court has observed that "the AACA is not a regular insurer; it is an administrative agency created by law to mitigate a serious problem in our society...." *Mercado Santini v. ·Superior Court*, 1 Offic.Trans.P.R. 723, 730 (1973).[8] In all events, it is settled that the state's classification does not control in deciding whether an activity is the "business of insurance" under the McCarran–Ferguson Act. *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 69, 79 S.Ct. 618, 620, 3 L.Ed.2d 640 (1959).

What unfortunately is not well settled is how the quoted phrase should be applied in the present rather unusual case. The term "insurance" is plastic and is used in different ways in different contexts. *See* R. Keeton & A. Widiss, *Insurance Law*, § 1.1(b) (Practitioners ed. 1988). The principal precedents in the Supreme Court

while furnishing some guidance have arisen in a different context, namely, in deciding whether practices associated with conventional private insurance companies should be deemed part of the "business of insurance" when challenged under the federal antitrust laws. *See, e.g., Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982).[9] Nor is legislative history very helpful because Congress in framing the McCarran–Ferguson Act was not concentrating on state discrimination at all, but rather on general state regulation and taxing authority and on the antitrust exposure of rating agencies. *See*, S.Rep. No. 20, 79th Cong., 1st Sess. 2–3 (1945). Yet on balance we are persuaded that Puerto Rico's accident compensation law is not the "business of insurance" that Congress meant to protect.

It is clear that Congress was not thinking at all about state social welfare or tort reform laws, but rather of conventional private insurance arrangements, when it passed the McCarran–Ferguson Act. *See Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 220–28, 99 S.Ct. 1067, 1077–81, 59 L.Ed.2d 261 (1979). We do not stress the word "private" for a state might be able to claim the benefits of the exemption if it chose itself to enter the conventional insurance business. *Compare Hass v. Oregon State Bar*, 883 F.2d 1453, 1464–71 (9th Cir.1989) (Ferguson, J., dissenting, noting the point without resolving it), *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990). What is critical is that the main thrust of the Puerto Rico statute is not the contractual spreading and underwriting of risk, the hallmark of insurance. *See Royal Drug*,

---

**8.** The court continued (*id.* at 730–31):

What the Social Protection Act establishes is a right to compensation independent of the negligence concept the purpose of which is to protect the traffic accident victims, offering them certain benefits that are not dependent on a previous determination of liability, nor on the solvency of the one liable. The AACA administers a system of compensations and services the financing of which is carried out through the distribution of the costs between the persons who are more directly related with the problem: the motorists. The fact that the AACA is the public instrumentality

created to administer the system of "Insurance" and compensation for traffic accidents, and that the contribution is called "premium" does not transform it into an insurer.

**9.** Further complicating the matter, the McCarran–Ferguson Act imposes requirements in order to shield such private activity from the antitrust laws. To claim exemption from the antitrust laws, a practice must not only be part of the "business of insurance" but, in addition, the state must regulate the insurance business and the practice must not be an act of boycott, coercion, or intimidation. 15 U.S.C. § 1013(b).

440 U.S. at 211, 99 S.Ct. at 1073. *See also SEC v. Nat'l Securities, Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969). As the Puerto Rico Supreme Court explained in *Mercado Santini*, the Puerto Rico statute here in issue provides state-assured compensation for accident victims regardless of driver (or victim) fault, imposing the cost of compensation on those who do the driving and cause the accidents. So viewed, the statute is akin to many enactments—quite unconnected to insurance—that create liability without fault or impose fees to cover costs.

While satisfied that the McCarran–Ferguson Act does not apply on these facts, we stress for the guidance of future litigants the narrowness of the holding on this issue. We are not, for example, ruling that a state-owned insurance company is necessarily outside the "business of insurance" or that a traditional or formal contract between an "insurer" and an "insured" is always needed to trigger the exemption. This is a protean field in which new laws and novel private arrangements are constantly emerging, and courts must be properly cautious in laying down rigid rules or mechanical formulas. *See Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield*, 883 F.2d 1101, 1108 (1st Cir.1989). It is enough for this case that the reasoning set forth above persuades us that the McCarran–Ferguson Act does not apply to protect Puerto Rico's discriminatory fee structure from the dormant Commerce Clause doctrine.

For the reasons stated, the judgment of the district court is *affirmed*.