In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3673

MICHAEL L. KATHREIN and VICTORIA KATHREIN,

*Plaintiffs-Appellants,*

*v.*

CITY OF EVANSTON, ILLINOIS, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 83—**Ronald A. Guzmán**, *Judge.*

ARGUED DECEMBER 7, 2010—DECIDED MARCH 11, 2011

Before RIPPLE, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Michael and Victoria Kathrein sued the City of Evanston, Illinois, and various officials ("Evanston"), pursuant to 42 U.S.C. § 1983, claiming Evanston's Affordable Housing Demolition Tax ("Demolition Tax") violates the Fifth and Fourteenth Amendments of the United States Constitution, the Illinois Constitution, and other Illinois law (Counts II-VII). They

also claimed that the Tax Injunction Act, 26 U.S.C. §7421(a) ("TIA"), violates Article V of the United States Constitution (Count I). Upon Evanston's motion, the district court dismissed for lack of subject matter jurisdiction. Because the Kathreins have standing and the TIA does not bar their challenges to the Demolition Tax, we reverse as to Counts II through VII. Because the Kathreins do not have standing to challenge the TIA, we affirm as to Count I.

## I. BACKGROUND

Evanston's Demolition Tax is part of an ordinance scheme designed to keep high-quality, affordable housing in Evanston. When applying for a permit to demolish a residential building, the property owner must pay a Demolition Tax of $10,000 per building or $3,000 per residential unit to be demolished, whichever is greater. The Demolition Tax raised $90,000 in each of Evanston's Fiscal Years 2006-07 and 2007-08. The proceeds of the Demolition Tax go to the city's Affordable Housing Fund, which helps low- and moderate-income residents find and keep affordable housing in Evanston.

The Demolition Tax does not apply to every demolition of a residential building. An exemption applies whenever the owner replaces the demolished structure with affordable housing or forms an agreement with the city to provide affordable housing by some other means. Another exemption applies when the property owner has lived in the building or unit for three years prior to demolition and will live for three years in the

replacement building. Finally, the Demolition Tax does not apply to any demolition ordered by the city or by an appropriate city official.

The Kathreins own property located at 1925 Jackson Avenue in Evanston. A single-family house is on the land. In fall 2007, the Kathreins agreed to sell the property to Eitan Ouzan, a real estate investor and developer, for $225,000. Shortly after agreeing to buy, Ouzan learned of Evanston's Demolition Tax. He demanded the sale price be reduced to offset the Demolition Tax. When the Kathreins refused, Ouzan refused to buy. The Kathreins now have no plan to sell the property or to demolish the house.

The Kathreins filed suit in federal district court, challenging the Demolition Tax under various constitutional theories. Evanston argued that the TIA divested the district court from considering these claims, so the Kathreins amended their complaint to include a claim challenging the constitutionality of the TIA. The district court granted Evanston's motion to dismiss, concluding that the TIA divested the court of jurisdiction and that the Kathreins did not have standing to challenge the TIA or the Demolition Tax. The Kathreins appealed. We appointed amicus curiae to provide briefing and argument on the Kathreins' behalf.

## II. ANALYSIS

We review *de novo* the district court's conclusion that the TIA divests it of jurisdiction over the Kathreins'

claims. *Hager v. City of West Peoria*, 84 F.3d 865, 868-69 (7th Cir. 1996). We also review *de novo* the district court's dismissal for lack of standing. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). But we review for clear error any factual findings upon which the court based its standing decision. *Id.*

## A. The Tax Injunction Act

The TIA provides that federal district courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The TIA applies to any claim in federal district court seeking declaratory or injunctive relief from state or municipal taxes, even when the claim challenges the constitutionality of the tax. *Scott Air Force Base Props., LLC v. Cnty. of St. Clair, Ill.*, 548 F.3d 516, 520 (7th Cir. 2008).

### 1. Distinguishing Taxes from Non-Taxes

The TIA does not apply to every transfer of money to a government, but only to taxes. *See Hager*, 84 F.3d at 872. The quintessential tax is imposed upon a broad population by a legislature to raise the revenue a government needs in order to function. *Id.* at 870. Courts have identified four types of payments to a government that are not taxes. Though courts have not consistently labeled each type of non-tax payment, we will call them: "user fees," "regulatory devices," "compensation charges,"

and "market exchanges." Before classifying Evanston's Demolition Tax, we briefly describe each of these non-tax payments.

A user fee generates only enough revenue to defray the costs of providing the service to which the user fee is attached. *Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 933 (9th Cir. 1996). The attached "service" may be agency regulation. *See San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 686-87 (1st Cir. 1992). The revenue from a user fee often goes to the regulatory agency providing the service, but a government cannot turn a user fee into a tax merely by directing the revenue to a general fund. *Hager*, 84 F.3d at 871. Regardless of where the revenue is directed, a charge is a user fee if—after offsetting the cost of the service—the charge does not generate significant revenue. *See San Juan Cellular*, 967 F.2d at 687.

A regulatory device, in contrast, directly regulates behavior by means of financial incentives. *RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indem. Co.*, 169 F.3d 448, 457-58 (7th Cir. 1999). Typically, courts have found a charge to be a regulatory device if the charge is attached to a behavior that is a clear candidate for deterrence. *See, e.g., Chambwer of Commerce v. Edmondson*, 594 F.3d 742, 763-64 (10th Cir. 2010) (failure to verify employees' legal employment status); *RTC Commercial*, 169 F.3d at 457-58 (tax delinquency). The identifying characteristic of a regulatory device is the incentive structure it creates to deter the targeted behavior. *See Edmondson*, 594 F.3d at 762-63.

A compensation charge is imposed upon those who cause a negative externality, and its proceeds are used to compensate those affected by the externality. *See Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 5-6 (1st Cir. 1992). In implementing a compensation charge, "the state is little more than a middleman for the involuntary transfer of property from one private owner to another." *Empress Casino Joliet Corp. v. Blagojevich*, ___ F.3d ___, ___, 2011 WL 710467, *12 (7th Cir. March 2, 2011). In other words, a compensation charge is not a tax because it does not contribute "to the central stream of tax revenue relied on by [the government]." *Trailer Marine,* 977 F.2d at 6.

A market exchange is a payment to the government that is part of an exchange in which the government acts as if it were "any ordinary market participant." *Am. Civil Liberties Union of Tenn. v. Bredesen*, 441 F.3d 370, 374-75 (6th Cir. 2006); *cf. Choose Life Ill., Inc. v. White*, 547 F.3d 853, 858 n.3 (7th Cir. 2008). The key question for distinguishing a market exchange from a tax is whether the payment is exchanged for a good or service that the government provides—but does not require. *See Arizona Life Coal. Inc. v. Stanton*, 515 F.3d 956, 962-63 (9th Cir. 2008) (explaining that the extra amount charged for a "special organization [license] plate" is not a tax because the government does not require a special plate).

### 2. Categorizing Evanston's Demolition Tax

Evanston's Demolition Tax lies between the quintessential tax and the quintessential regulatory device. To

categorize the Demolition Tax, we must decide whether its purpose is to regulate behavior or to raise revenue. *See RTC Commercial*, 169 F.3d at 457-58.

The statute or ordinance creating a charge may provide evidence of its purpose, though the enacting government's characterization of a charge is not determinative. *Trailer Marine*, 977 F.2d at 5. Evanston's ordinances call the charge a "tax," and the stated purpose of the charge is "to provide a source of funding for the creation, maintenance, and improvement of safe and decent affordable housing." Evanston, Ill., Code §§ 4-22-1, 4-22-3. This language suggests the Demolition Tax is a tax, but other features of the ordinance weigh against this suggestion.

When a charge creates an incentive structure that has the clear effect of regulating disfavored behavior, it is probably a regulatory device. *See RTC Commercial*, 169 F.3d at 457-58. Here, Evanston was apparently concerned that developers were demolishing too many low-income homes and replacing them with high-income housing. The Demolition Tax raises the cost of demolition, and the exceptions were carefully constructed not to deter those demolitions Evanston deemed beneficial—or at least less harmful. The two main exceptions apply to: (1) any building or unit in which the owner has lived for three years before demolition and will live for three years after the new construction and (2) any owner who will provide affordable housing to replace the demolished building. By designing a complex scheme deterring only the demolitions it deems most harmful,

Evanston reveals the likely purpose of the charge—to deter precisely those demolitions.

We must note that not every charge attached to an undesirable behavior is a regulatory device. In fact, a tax imposed only upon a socially disfavored behavior is often a more politically feasible way to raise revenue than a broad-based tax. *See* Jendi B. Reiter, Essay, *Citizens or Sinners?—The Economic and Political Inequity of "Sin Taxes" on Tobacco and Alcohol Products*, 29 Colum J. L. & Soc. Probs. 443, 445-51 (1996). So we must look to other factors to determine the purpose of a charge imposed on undesired behavior.

Perhaps the most informative factors are the amount of the charge and the price elasticity of the behavior. *Cf. Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 189 (4th Cir. 2007) (concluding that a charge calculated to exactly offset the benefits of undesired behavior was a fee). Here, the charge for demolition is $10,000—roughly 4.4% of the price at which the Kathreins claim to have found a purchaser. While we cannot directly measure price elasticity, we note that existing homes are close substitutes for newly-built homes that have replaced demolished homes. Presumably, Evanston has a substantial supply of existing homes, and any developer who plans to demolish and rebuild must compete with sellers of these existing homes. The $10,000 Demolition Tax makes building new homes in place of demolished homes significantly less profitable for developers, thereby deterring developers from buying and demolishing low-income homes—hence, the plaintiffs' frustration with the ordinance.

Another useful factor is the amount of revenue raised by the charge. If the purpose of the Demolition Tax is to raise revenue—as the ordinance purports—we should expect it to actually raise significant revenue. We recognized this common sense notion in *Hager*: "It places form over substance to conclude that $20.00 actually collected and deposited in the city's general coffers render these ordinances tax legislation." 84 F.3d at 871. In Fiscal Year 2006-07, Evanston's Demolition Tax raised $90,000, while the city's total general fund revenues were roughly $88 million. City of Evanston, *FY 2008-09 Budget* 69, 443 (2008). In 2007-08, the Demolition Tax again raised $90,000, while general fund revenues were roughly $92 million. City of Evanston, *FY 2009-10 Budget* 68, 433 (2009). While the Demolition Tax has raised more revenue than the charge in *Hager*, it has raised only about one-thousandth the amount of general fund revenues. This ratio suggests that federal court review of the Demolition Tax "poses no threat to the central stream of tax revenue relied on" by the city.[1] *Trailer Marine*, 977 F.2d at 6.

We are especially sure that review of the Demolition Tax will not threaten the revenue on which Evanston relies because proceeds of the Demolition Tax do not supply the city's general fund. Rather, the proceeds

---

[1] We would put Evanston's revenue stream at greater risk by reviewing the city's library fines and fees, which accounted for $182,477 in 2006-07 and $177,962 in 2007-08. Evanston, *2008-09 Budget* at 72; Evanston, *2009-10 Budget* at 71.

supply an Affordable Housing Fund, which helps low- and moderate-income residents afford housing in Evanston. The Fund gives these residents an incentive to remain in their homes in Evanston, further promoting the maintenance of affordable housing in the city. When a government directs proceeds from a charge to a separate fund, it suggests the purpose of the charge is not to raise revenue. *See id.* Here, the use of the proceeds strongly supports our conclusion that the purpose of the charge is to regulate behavior because the proceeds are used, in part, to amplify the regulatory efficacy of the charge.

### B. Standing

One of the Kathreins' claims challenged the constitutionality of the TIA. Because the TIA does not divest jurisdiction from the Kathreins' challenge to Evanston's Demolition Tax, it has caused them no injury, and they have no standing to challenge its constitutionality. The only remaining issue is whether the Kathreins have standing to challenge the Demolition Tax.

We begin our analysis of this issue by noting that the Kathreins did not forfeit or waive their standing arguments in the district court. In response to Evanston's motion to dismiss for lack of jurisdiction, the Kathreins— citing Supreme Court standing decisions—argued that they had met the requirements for Article III standing. Confusingly, Michael Kathrein made—and Victoria adopted—this argument under the heading "Plaintiff's Relief Sought is Outside the Scope of the Act." This

mistake makes the court's task more difficult, but it does not foreclose a standing argument on appeal. *See Balentine v. Thaler*, 626 F.3d 842, 849 (5th Cir. 2010) ("Errant headings . . . do not waive arguments.").

As plaintiffs, the Kathreins bore the burden of proof as to standing. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). Because Evanston launched a factual challenge, the Kathreins must have shown their standing by the preponderance of the evidence. *See Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003). To establish standing, the Kathreins must have shown: "(1) that [they have] suffered an injury in fact (2) that is fairly traceable to the action of the defendant and (3) that will likely be redressed with a favorable decision." *Books v. City of Elkhart, Ind.*, 235 F.3d 292, 299 (7th Cir. 2000).

The parties, amicus curiae, and the district court have identified several injuries, alleged injuries, and theories that do not give the Kathreins standing. We begin with the district court's conclusion that the Kathreins' status as taxpayers does not confer them standing. This conclusion is certainly true, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345-46 (2006), but the Kathreins do not rely on their status as taxpayers for standing. Rather, they claim the enactment of the Demolition Tax caused them direct financial injury.

Next, as Evanston correctly argues, the Kathreins have not shown they were injured by the increased cost of demolishing the house on their property because they have shown no past, present, or future interest in

having the house demolished. They are far more likely to sell the property to a developer, who would demolish the building, replace it with a more valuable one, and then resell the property.

Finally, amicus curiae argues the Kathreins' "injury in fact" was the failed real estate transaction with Ouzan. But there is no reason to believe this injury would be redressed by a favorable decision—after all, the failed transaction took place more than three years ago. This injury does not create standing for the Kathreins.

The failed real estate transaction does provide evidence of a related injury that is remediable: a decrease in the value of the Kathreins' property.[2] A demonstrable reduction in the market value of one's property is an injury in fact for standing purposes. *See Marusic Liquors, Inc. v. Daley*, 55 F.3d 258, 260 (7th Cir. 1995). And an ordinance that meaningfully restricts the salability of property necessarily reduces the property's market value. *See MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 744 (7th Cir. 2007).

Though the Demolition Tax does not attach directly to the sale of property, it nonetheless affects the market value of a certain class of Evanston residential proper-

---

[2] The district court may have found that the Demolition Tax did not cause the Kathreins' property value to decrease by $10,000. If the district court did make such a finding, it was not clearly erroneous. But it also does not preclude our finding that the property decreased in value by some lesser amount sufficient to confer standing.

ties—those that are more valuable because of the option to demolish and replace the existing building. As suggested above, the owner of a property that is a candidate for demolition is unlikely to have the building demolished herself unless she is in the business of real estate development. Rather, she will sell the property to a developer who will demolish and replace the building, thereby triggering the Demolition Tax. But the Demolition Tax decreases the value of the option to demolish, so developers will offer less for the property. The Demolition Tax thus decreases the market value of any property for which the option to demolish the existing building has non-negligible value.

Not every property in Evanston meets this criterion. For example, a one-acre property that houses a million-dollar home is extremely unlikely to be a candidate for (non-emergency) demolition in the foreseeable future. Because demolition is extremely unlikely, the option to demolish is essentially worthless. The Demolition Tax likely would not affect the value of such a property. The Kathreins, in contrast, have provided evidence—their own deposition testimonies and Ouzan's signed affidavit—of the value of the option to demolish the structure on their property. Once Ouzan learned of the Demolition Tax, he refused to buy the Kathreins' property unless they would sell it for a lower price to offset the cost of the Demolition Tax. This failed sale shows that the property was more valuable because of the option to demolish. Based on this evidence, and because Evanston did not effectively contest the truth of Ouzan's testimony or present countervailing evi-

dence, the Kathreins have demonstrated a reduction in the value of their property.

Evanston's final argument is that the Kathreins have not been injured because they have no current plans to sell their property. But this argument ignores our decision in *Marusic Liquors*, where we recognized that a restriction on selling a property injures the property owner even if he has "no immediate plan to sell." 55 F.3d at 260. The plaintiff in *Marusic Liquors* challenged an ordinance that limited the transfer of businesses that had liquor licenses in certain geographic zones. *Id.* We noted that, because of the ordinance, potential buyers would ignore the affected liquor store, thereby lowering the chances of an attractive purchase offer. *Id.* at 261. We also noted that the owner would under-investigate alternative business and employment opportunities and under-invest in making the store attractive to potential buyers. *Id.*

The Kathreins face similar costs to those mentioned in *Marusic Liquors*. Developers will likely look elsewhere, thereby reducing the chances of the Kathreins receiving an attractive offer. And the Kathreins will likely under-investigate other housing options and over-invest in making their home attractive to potential non-developer buyers. Moreover, the Kathreins will be less able to obtain a favorable mortgage because the Demolition Tax makes their home less valuable to potential mortgage holders.

In sum, the Kathreins have suffered an actual injury—a demonstrable reduction in property value—that is

sufficiently concrete and particularized to constitute an "injury in fact." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That injury was caused by the enactment of the Demolition Tax, and an injunction against enforcing the Demolition Tax will restore the property to its full value.[3] Based on this injury, then, the Kathreins have standing to challenge the Demolition Tax.

### C. Ripeness

The district court hinted that some of the Kathreins' claims are not ripe for consideration in federal court. Federal courts lack jurisdiction to consider an unripe claim, *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 544 (7th Cir. 2008), so any question of ripeness should be decided before consideration of a claim's merits. The parties did not thoroughly brief any ripeness arguments on appeal, so we leave this issue to the parties and the district court on remand.

---

[3] The Kathreins claim an injunction will return their property to its pre-ordinance value. But the Demolition Tax was enacted in 2005. Since then, market-wide forces likely have affected the value of their property. *See* Al Yoon, *Home price drops exceed Great Depression: Zillow*, Reuters Newswire (Jan. 11, 2011), available at http://www.reuters.com/article/idUSTRE70961E20110111. We expect that an injunction, if issued, would remedy only the damage caused by the Demolition Tax.

### III. CONCLUSION

Because the Kathreins have no standing to challenge the TIA, we AFFIRM the district court's dismissal of Count I for lack of jurisdiction. Because the Tax Injunction Act does not apply to the Kathreins' challenge of Evanston's Demolition Tax and because the Kathreins have standing to challenge the Demolition Tax, we REVERSE the district court's dismissal of Counts II through VII for lack of jurisdiction and REMAND for further proceedings.