Filed:  February 2, 2007

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 06-1840
(1:06-cv-00316-JFM)


RETAIL INDUSTRY LEADERS ASSOCIATION,

                                    Plaintiff - Appellee,

        versus

JAMES D. FIELDER, JR., in his official
capacity as Maryland Secretary of
Labor, Licensing, and Regulation,

                                    Defendant - Appellant,

------------------------

AARP; MEDICAID MATTERS,!Maryland;
MARYLAND CITIZENS' HEALTH INITIATIVE
EDUCATION FUND, INCORPORATED;

                                    Amici Supporting Appellant,

NATIONAL FEDERATION OF INDEPENDENT
BUSINESS LEGAL FOUNDATION; MARYLAND
CHAMBER OF COMMERCE; SECRETARY OF
LABOR; CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA; SOCIETY
FOR HUMAN RESOURCE MANAGEMENT; THE
HR POLICY ASSOCIATION; AMERICAN
BENEFITS COUNCIL

                                    Amici Supporting Appellee.


                    _____


                        No. 06-1901
                      1:06-cv-00316-JFM
                    _____


RETAIL INDUSTRY LEADERS ASSOCIATION,

                                    Plaintiff - Appellant,

                versus

JAMES D. FIELDER, JR., in his official
capacity as Maryland Secretary of Labor,
Licensing, and Regulation,

                                    Defendant - Appellee,

------------------------

NATIONAL FEDERATION OF INDEPENDENT
BUSINESS LEGAL FOUNDATION; MARYLAND
CHAMBER OF COMMERCE; SECRETARY OF LABOR;
CHAMBER OF COMMERCE OF THE UNITED STATES
OF AMERICA; SOCIETY FOR HUMAN RESOURCE
MANAGEMENT; THE HR POLICY ASSOCIATION;
AMERICAN BENEFITS COUNCIL,

                                    Amici Supporting Appellant,

AARP; MEDICAID MATTERS,!Maryland; MARYLAND
CITIZENS' HEALTH INITIATIVE EDUCATION
FUND, INCORPORATED,

                                    Amici Supporting Appellee,

                    ————————

                    O R D E R

                    ————————

        Upon notification from *amicus* AARP that their correct legal

name is "AARP" rather than "American Association of Retired

Persons," the court amends the opinion in this case as follows:

        In the case caption for 06-1840 on page 1, "AARP" is

substituted for "American Association of Retired Persons" in the

first line of the "*Amici Supporting Appellee.*"

        In the case caption for 06-1901 on page 2, "AARP" is

substituted for "American Association of Retired Persons" in the

first line of the "*Amici Supporting Appellee.*"

In line 22 of the counsel section on page 3, "AARP" is substituted for "American Association of Retired Persons."

For the Court - By Direction

/s/ Patricia S. Connor

_____

Clerk

**CORRECTED OPINION**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RETAIL INDUSTRY LEADERS ASSOCIATION,
*Plaintiff-Appellee,*

v.

JAMES D. FIELDER, JR., in his official
capacity as Maryland Secretary of
Labor, Licensing, and Regulation,
*Defendant-Appellant.*

AARP; MEDICAID
MATTERS!MARYLAND; MARYLAND
CITIZENS' HEALTH INITIATIVE EDUCATION
FUND, INCORPORATED,
    *Amici Supporting Appellant,*

NATIONAL FEDERATION OF INDEPENDENT
BUSINESS LEGAL FOUNDATION;
MARYLAND CHAMBER OF COMMERCE;
SECRETARY OF LABOR; CHAMBER OF
COMMERCE OF THE UNITED STATES OF
AMERICA; SOCIETY FOR HUMAN
RESOURCE MANAGEMENT; THE HR
POLICY ASSOCIATION; AMERICAN
BENEFITS COUNCIL,
    *Amici Supporting Appellee.*

No. 06-1840

RETAIL INDUSTRY LEADERS ASSOCIATION,
                    *Plaintiff-Appellant,*

                    v.

JAMES D. FIELDER, JR., in his official
capacity as Maryland Secretary of
Labor, Licensing, and Regulation,
                    *Defendant-Appellee.*

NATIONAL FEDERATION OF INDEPENDENT
BUSINESS LEGAL FOUNDATION;
MARYLAND CHAMBER OF COMMERCE;
SECRETARY OF LABOR; CHAMBER OF          No. 06-1901
COMMERCE OF THE UNITED STATES OF
AMERICA; SOCIETY FOR HUMAN
RESOURCE MANAGEMENT; THE HR
POLICY ASSOCIATION; AMERICAN
BENEFITS COUNCIL,
                    *Amici Supporting Appellant,*

AARP; MEDICAID
MATTERS!MARYLAND; MARYLAND
CITIZENS' HEALTH INITIATIVE EDUCATION
FUND, INCORPORATED,
                    *Amici Supporting Appellee.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:06-cv-00316-JFM)

Argued: November 30, 2006

Decided: January 17, 2007

Counsel Section Corrected: January 23, 2007

Before NIEMEYER, MICHAEL, and TRAXLER, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Traxler joined. Judge Michael wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Steven Marshall Sullivan, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for James D. Fielder, Jr., in his official capacity as Maryland Secretary of Labor, Licensing, and Regulation. William Jeffrey Kilberg, GIBSON, DUNN & CRUTCHER, L.L.P., Washington, D.C., for Retail Industry Leaders Association. Timothy David Hauser, Associate Solicitor, UNITED STATES DEPARTMENT OF LABOR, Office of the Solicitor, Washington, D.C., for Amici Supporting Retail Industry Leaders Association. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Margaret Ann Nolan, Assistant Attorney General, Gary W. Kuc, Assistant Attorney General, Carl N. Zacarias, Staff Attorney, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland; Robert A. Zarnoch, Assistant Attorney General, Kathryn M. Rowe, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Annapolis, Mary-land, for James D. Fielder, Jr., in his official capacity as Maryland Secretary of Labor, Licensing, and Regulation. W. Stephen Cannon, Todd Anderson, CONSTANTINE CANNON, P.C., Washington, D.C.; Eugene Scalia, Paul Blankenstein, William M. Jay, GIBSON, DUNN & CRUTCHER, L.L.P., Washington, D.C., for Retail Industry Leaders Association. Mary Ellen Signorille, Jay E. Sushelsky, AARP FOUNDATION; Melvin Radowitz, AARP, Washington, D.C., for AARP, Amicus Supporting James D. Fielder, Jr., in his official capacity as Maryland Secretary of Labor, Licensing, and Regulation. Steven D. Schwinn, Professor, UNIVERSITY OF MARYLAND SCHOOL OF LAW, Baltimore, Maryland, for Medicaid Matters!Maryland, Amicus Supporting James D. Fielder, Jr., in his official capacity as Maryland Secretary of Labor,

Licensing, and Regulation. Suzanne Sangree, PUBLIC JUSTICE CENTER, Baltimore, Maryland; Michael A. Pretl, Salisbury, Maryland, for Maryland Citizens' Health Initiative Education Fund, Incorporated, Amicus Supporting James D. Fielder, Jr., in his official capacity as Maryland Secretary of Labor, Licensing, and Regulation. Karen R. Harned, Elizabeth A. Gaudio, NFIB LEGAL FOUNDATION, Washington, D.C.; Leslie Robert Stellman, HODES, ULMAN, PESSIN & KATZ, P.A., Towson, Maryland, for National Federation of Independent Business Legal Foundation, Amicus Supporting Retail Industry Leaders Association. Richard L. Hackman, SMITH & DOWNEY, P.A., Baltimore, Maryland, for Maryland Chamber of Commerce, Amicus Supporting Retail Industry Leaders Association. Howard M. Radzely, Solicitor of Labor, Karen L. Handorf, Counsel for Appellate and Special Litigation, James Craig, Senior Attorney, UNITED STATES DEPARTMENT OF LABOR, Office of the Solicitor, Plan Benefits Security Division, Washington, D.C., for Secretary of Labor, Amicus Supporting Retail Industry Leaders Association. James P. Baker, Heather Reinschmidt, JONES DAY, San Francisco, California; Willis J. Goldsmith, JONES DAY, New York, New York, for Chamber of Commerce of the United States of America, Amicus Supporting Retail Industry Leaders Association. Thomas M. Cristina, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Greenville, South Carolina, for The Society for Human Resource Management, The HR Policy Association, and American Benefits Council, Amici Supporting Retail Industry Leaders Association.

---

**OPINION**

NIEMEYER, Circuit Judge:

On January 12, 2006, the Maryland General Assembly enacted the Fair Share Health Care Fund Act, which requires employers with 10,000 or more Maryland employees to spend at least 8% of their total payrolls on employees' health insurance costs or pay the amount their spending falls short to the State of Maryland. Resulting from a nationwide campaign to force Wal-Mart Stores, Inc., to increase health insurance benefits for its 16,000 Maryland employees, the Act's minimum spending provision was crafted to cover just Wal-

Mart. The Retail Industry Leaders Association, of which Wal-Mart is a member, brought suit against James D. Fielder, Jr., the Maryland Secretary of Labor, Licensing, and Regulation, to declare that the Act is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA") and to enjoin the Act's enforcement. On cross-motions for summary judgment, the district court entered judgment declaring that the Act is preempted by ERISA and therefore not enforceable, and this appeal followed.

Because Maryland's Fair Share Health Care Fund Act effectively requires employers in Maryland covered by the Act to restructure their employee health insurance plans, it conflicts with ERISA's goal of permitting uniform nationwide administration of these plans. We conclude therefore that the Maryland Act is preempted by ERISA and accordingly affirm.

I

Before enactment of the Fair Share Health Care Fund Act ("Fair Share Act"), 2006 Md. Laws 1, Md. Code Ann., Lab. & Empl. §§ 8.5-101 to -107, the Maryland General Assembly heard extensive testimony about the rising costs of the Maryland Medical Assistance Program (Medicaid and children's health programs). It learned that between fiscal years 2003 and 2006, annual expenditures on the Program increased from $3.46 billion to $4.7 billion. The General Assembly also perceived that Wal-Mart Stores, Inc., a particularly large employer, provided its employees with a substandard level of healthcare benefits, forcing many Wal-Mart employees to depend on state-subsidized healthcare programs. Indeed, the Maryland Department of Legislative Services (which has the duties of providing the Maryland General Assembly with research, analysis, assessments, and evaluations of legislative issues) prepared an analytical report of the proposed Fair Share Act for the General Assembly, that discussed only Wal-Mart's employee benefits practices. In the background portion of the report, the Department of Legislative Services wrote:

> Several States, facing rapidly-increasing Medicaid costs, are turning to the private sector to bear more of the costs. Wal-Mart, in particular, has been the focus of several states, who are accusing the company of providing substandard health

benefits to its employees. According to the *New York Times*, Wal-Mart full-time employees earn an average $1,200 a month, or about $8 an hour.

Some states claim many Wal-Mart employees end up on public health programs such as Medicaid. A survey by Georgia officials found that more than 10,000 children of Wal-Mart employees were enrolled in the state's children's health insurance program (CHIP) at a cost of nearly $10 million annually. Similarly, a North Carolina hospital found that 31% of 1,900 patients who said they were Wal-Mart employees were enrolled in Medicaid, and an additional 16% were uninsured.

As a result, some States have turned to Wal-Mart to assume more of the financial burden of its workers' health care costs. California passed a law in 2003 that will require most employers to either provide health coverage to employees or pay into a state insurance pool that would do so. Advocates of the law say Wal-Mart employees cost California health insurance programs about $32 million annually. Washington state is exploring implementing a similar state law.

According to the [*New York*] *Times*, Wal-Mart said that its employees are mostly insured, citing internal surveys showing that 90% of workers have health coverage, often through Medicare or family members' policies. Wal-Mart officials say the company provides health coverage to about 537,000, or 45% of its total workforce. As a matter of comparison, Costco Wholesale provides health insurance to 96% of eligible employees.

In response, the General Assembly enacted the Fair Share Act in January 2006, to become effective January 1, 2007. The Act applies to employers that have at least 10,000 employees in Maryland, Md. Code Ann., Lab. & Empl. § 8.5-102, and imposes spending and reporting requirements on such employers. The core provision provides:

An employer that is not organized as a nonprofit organization and does not spend up to 8% of the total wages paid to

employees in the State on health insurance costs shall pay to the Secretary an amount equal to the difference between what the employer spends for health insurance costs and an amount equal to 8% of the total wages paid to employees in the State.

*Id.* § 8.5-104(b). An employer that fails to make the required payment is subject to a civil penalty of $250,000. *Id.* § 8.5-105(b).

The Act also requires a covered employer to submit an annual report on January 1 of each year to the Secretary, in which the employer must disclose: (1) how many employees it had for the prior year, (2) its "health insurance costs," and (3) the percentage of compensation it spent on "health insurance costs" for the "year immediately preceding the previous calendar year." *Id.* § 8.5-103(a)(1). The Act defines "health insurance costs" to include expenditures on both healthcare and health insurance to the extent that they are deductible under § 213(d) of the Internal Revenue Code. *Id.* § 8.5-101.

Any payments collected by the Secretary are directed to the Fair Share Health Care Fund, which is held by the Treasurer of the State and accounted for by the State Comptroller like all other state funds. Md. Code Ann., Health-Gen. § 15-142(d), (g). The funds so collected, however, may be used only to support the Maryland Medical Assistance Program, which consists of Maryland's Medicaid and children's health programs. *Id.* § 15-142(f).

The record discloses that only four employers have at least 10,000 employees in Maryland: Johns Hopkins University, Giant Food, Northrop Grumman, and Wal-Mart. The Fair Share Act subjected Johns Hopkins, as a nonprofit organization, to a lower 6% spending threshold which Johns Hopkins already satisfies. Giant Food, which employs unionized workers, spends over the 8% threshold on health insurance and lobbied in support of the Fair Share Act. Northrop Grumman, a defense contractor, was subject to the minimum spending requirement in an earlier version of the Act, but the General Assembly included an amendment that effectively excluded Northrop Grumman. Because Northrop Grumman has many high-salaried employees in Maryland, the General Assembly was able to exclude it by an amendment that permits an employer, in calculating its total

wages paid, to exempt compensation paid to employees in excess of the median household income in Maryland. *See* Md. Code Ann., Lab. & Empl. § 8.5-103(b)(1). The parties agree that only Wal-Mart, who employs approximately 16,000 in Maryland, is currently subject to the Act's minimum spending requirements. Wal-Mart representatives testified that it spends about 7 to 8% of its total payroll on healthcare, falling short of the Act's 8% threshold.

The legislative record also makes clear that legislators and affected parties assumed that the Fair Share Act would force Wal-Mart to increase its spending on healthcare benefits rather than to pay monies to the State. For example, one of the Act's sponsors, Senator Thomas V. Mike Miller, Jr., Maryland Senate President, described the Act during a floor debate: "It takes people who should be getting health benefits at work off the [State's] rolls and *it requires those employers to provide it*." Floor Debate on Senate Bill 790, 2006 Leg., 421st Sess., (Md. Jan. 12, 2006) (emphasis added).

Shortly after enactment of the Fair Share Act, the Retail Industry Leaders Association ("RILA") commenced this action against the Maryland Secretary of Labor, Licensing, and Regulation to declare the Act preempted by ERISA and to enjoin the Secretary from enforcing it. RILA is a trade association whose members are major companies from all segments of retailing, including Wal-Mart, as well as many of Wal-Mart's competitors, such as Best Buy Company, Target Corporation, Lowe's Companies, and IKEA. Many of these competitors are represented on RILA's board, which voted unanimously to authorize RILA to prosecute this action.

RILA's complaint alleged that the Fair Share Act was preempted by ERISA, 29 U.S.C. § 1144. It also alleged that the Fair Share Act violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the "special law" prohibition of the Maryland Constitution, art. III, § 33.

Shortly after filing its complaint, RILA filed a motion for summary judgment on its ERISA-preemption claim and its equal-protection claim. In response, the Secretary filed a motion to dismiss RILA's complaint for lack of jurisdiction, arguing (1) that RILA lacked standing; (2) that its claims were not ripe; and (3) that its complaint was

barred by the Tax Injunction Act, 28 U.S.C. § 1341, which prohibits federal courts in most cases from enjoining, suspending, or restraining a State's collection of taxes. In the alternative, the Secretary filed a cross-motion for summary judgment addressing all three of RILA's claims.

The district court rejected the Secretary's jurisdictional arguments and concluded that ERISA preempted the Fair Share Act because the Act effectively mandated that employers spend a minimum amount on healthcare benefit plans. The court also found that the Fair Share Act did not violate the Equal Protection Clause because the Act's classifications were not irrational. Each party appealed, challenging the rulings adverse to it.

## II

We address first the Secretary's jurisdictional challenges based on standing, ripeness, and the Tax Injunction Act.

## A

While RILA does not assert injury to itself, it claims "associational standing" to enforce the rights of its members. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 345 (1977) (authorizing the standing of an association when (a) its members would otherwise have standing[1] to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit"). Associational standing may exist even when just one of the association's members would have standing. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) (explaining that an "association must allege that its members, *or any one of them*, are suffering immediate or threatened injury" (emphasis added)).

---

[1]The well-known criteria for standing are that the plaintiff must allege an (1) injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Allen v. Wright*, 468 U.S. 737, 751 (1984).

The Secretary argues first that no member of RILA has standing to sue in its own right because the injuries claimed in this case are not sufficiently imminent. He notes that the Fair Share Act is not yet effective and that he has not yet promulgated regulations implementing the Act.

To be sure, the alleged injury must, for standing purposes, be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. But "one does not have to await the consummation of threatened injury to obtain preventative relief. If the injury is certainly impending, that is enough." *Friends of the Earth, Inc. v. Gaston Cooper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

In this case, if Wal-Mart's injury is not actual, it is certainly impending. First, RILA alleges, and the district court concluded, that Wal-Mart's healthcare spending falls below 8% of its total wages. Accordingly, Wal-Mart faces the imminent injury of being forced either to increase its healthcare spending by January 1, 2007, or to make a payment to the Secretary. Second, the Fair Share Act's reporting requirements impose administrative burdens on Wal-Mart even now. According to Wal-Mart's Director of United States Benefits Design, Wal-Mart presently administers its healthcare plans on a nationwide basis and does not specifically track its expenditures for Maryland employees. Thus, the Act will force Wal-Mart to alter its internal accounting practices to acquire the information required for the report that is due on January 1, 2007, and to incur expenses now in preparing and filing it with the Secretary. Finally, the Act's minimum spending provision will hamper Wal-Mart's ability to administer its employee benefit plans in a uniform manner across the nation. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658-59 (1999) (describing uniform plan administration as a benefit that ERISA gives to employers).

The Secretary also argues, focusing only on the 8% threshold spending requirement, that Wal-Mart's alleged injury is merely "hypothetical" because it is not certain that Wal-Mart's healthcare expenditures fall below 8%. To make this argument, the Secretary lifted out of context a fragment from the testimony of a Wal-Mart representa-

tive given before a legislative committee that Wal-Mart's healthcare spending "could be at 10 or 12 percent, but we don't know." In the next breath, however, the representative stated, "Based off the definitions under this bill, we took plenty of time — Lisa Woods spent plenty of time researching the different areas of law . . . we believe we do fall at 7 or 8%." At least four Wal-Mart representatives testified before a legislative committee or by affidavit that Wal-Mart spends below 8% of its total payroll on healthcare. If the Secretary seriously does not believe that Wal-Mart spends below 8% on healthcare benefits, then he second-guesses the General Assembly which focused on this fact as the reason to enact the Fair Share Act in the first place.

Seeking to undermine RILA's satisfaction of another element necessary for associational standing, the Secretary contends that the nature of RILA's suit requires that at least one of its members, Wal-Mart, participate in the lawsuit, thus destroying the basis for RILA's associational standing. *See Hunt*, 432 U.S. at 435. This argument is somewhat peculiar because the Secretary has maintained that the Act is not special legislation directed at Wal-Mart. Even so, based on the nature of the action actually filed and the relief sought, we see little, if any, need for Wal-Mart or any other RILA member to present individualized proof. RILA's two challenges to the Fair Share Act — preemption under ERISA and violation of the Equal Protection Clause — require the court to make judgments regarding the nature and operation of the Act generally and require no findings of fact regarding the specific operations of Wal-Mart or other RILA members. While the Secretary may wish to challenge the suggestion that Wal-Mart's healthcare spending fails to satisfy the 8% threshold, such a challenge would still not address the other injuries in fact sustained by Wal-Mart, as we discussed above. Nor does the relief requested depend upon proofs particular to individual members. Unlike a suit for money damages, which would require examination of each member's unique injury, this action seeks a declaratory judgment and injunctive relief, the type of relief for which associational standing was originally recognized. *See Warth*, 422 U.S. at 515.

Finally, the Secretary argues that associational standing is not appropriate because various RILA members supposedly have conflicting interests. *See Md. Highways Contractors Ass'n, Inc. v. Mary-*

*land*, 933 F.2d 1246, 1252-53 (4th Cir. 1991). In *Maryland Highways Contractors*, an association of contractors challenged a Maryland program that preferred businesses owned primarily by minorities in awarding state procurement contracts. *Id.* at 1248. We explained that associational standing was not appropriate "when conflicts of interest among members of the association require that the members must join the suit individually in order to protect their own interests." *Id.* at 1252. That case, however, is readily distinguishable from this one. While RILA members do compete in the marketplace, they uniformly endorsed the present litigation. RILA's board includes representatives from numerous competitors of Wal-Mart, including Best Buy Company, IKEA, and Target Corporation, and the board voted *unanimously* to prosecute this action. Unlike *Maryland Highways Contractors*, *id.* (noting that no minority-owned businesses were represented on the association's board and that the board did not inform its membership of the suit), this case presents no hint that RILA's board authorized this suit without the knowledge or support of any RILA member or faction.

At bottom, the prudential considerations of the *Hunt* test for associational standing do not counsel against permitting RILA to bring this suit, and we reject the Secretary's challenge on that ground.

B

For reasons similar to those advanced to challenge RILA's standing, the Secretary contends that RILA's claims are not ripe for review. He argues that because Wal-Mart is not certain to suffer injury under the Fair Share Act, RILA's action is not ripe. *See Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 200 (1983) (noting the purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies").

A ripeness review consists of inquiries into "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Pacific Gas & Elec.*, 461 U.S. at 201. An issue is not fit for review if "it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."

*Texas v. United States*, 523 U.S. 296, 300 (1998). But if an issue is "predominantly legal," not depending upon the potential occurrence of factual events, it is more likely to be found ripe. *Pacific Gas & Elec.*, 461 U.S. at 201.

As we have explained, Wal-Mart will very likely incur liability to the State under the Act's minimum spending provision and is certainly subject to the reporting requirements. Accordingly, it must alter its internal accounting procedures and healthcare spending *now* to comply with the Act. The Secretary's argument that the issues are unripe because the regulations under the Act have not been promulgated do not change this. Regulations could not alter the Act's provisions, which clearly establish the healthcare spending and reporting requirements that RILA claims are invalid. In addition, this appeal presents purely legal questions that, because of their certain applicability to Wal-Mart, are ripe for review. Accordingly, we also reject the Secretary's ripeness challenge.

C

Finally, the Secretary contends that this litigation is barred by the Tax Injunction Act, 28 U.S.C. § 1341. He characterizes the Fair Share Act as a state law that imposes a *tax* on employers. The district court disagreed and concluded that the Fair Share Act constitutes a "healthcare regulation," rather than a "tax." We agree with the district court.

The Tax Injunction Act prohibits district courts from enjoining, suspending, or restraining the assessment, levy, or collection of any tax under state law where, as the Act provides, "a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. Because the Tax Injunction Act is meant to prevent taxpayers from "disrupting state government finances," *Hibbs v. Winn*, 542 U.S. 88, 104 (2004), its applicability depends primarily on whether a given measure serves "revenue raising purposes" rather than "regulatory or punitive purposes." *See Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000). The less a measure serves as a revenue-raising provision, the less likely it is protected by the Tax Injunction Act. *See Hager v. City of W. Peoria*, 84 F.3d 865, 870-72 (7th Cir. 1996) (finding the Tax Injunction Act did not bar review of a provi-

sion because "the ordinances were passed to control certain activities, not to raise revenues").

While the *Valero* court provided various inquiries to help determine whether a charge imposed by state law is a tax, i.e., primarily a revenue-raising measure, or a fee or penalty, *see Valero*, 205 F.3d at 134 ("(1) What entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge" ), we can readily conclude, without a seriatim analysis, that the Fair Share Act is not a tax provision. There is overriding evidence that the Fair Share Act's primary purpose is to regulate employers' healthcare spending, not to raise revenue. This becomes especially demonstrable in light of the improbability that the Act will generate *any* revenue. Wal-Mart's Director of Benefits Design testified that Wal-Mart would increase its healthcare spending rather than make payments to the State, denying the State any revenue from the measure. The circumstances surrounding the Act's enactment confirms that this is precisely the result that the General Assembly intended. Particularly persuasive is the Department of Legislative Services' description of the Act in which it stated, "To the extent large employers do not spend at least 6% or 8% on health insurance costs *as required*, Fair Share Health Care special fund's revenues could increase from employers paying the difference between the *required* and actual amounts spent on health insurance" (emphasis added). Thus, the official description of the Act as presented to the General Assembly represented that it *mandated* that employers provide a certain level of benefits, and only if they violated that mandate would the State collect monies. Such a mechanism is a quintessential fee or penalty, not a tax.

The Secretary argues to the contrary by pointing to the fact that the Fair Share Act itself declares its purpose to establish "the Fair Share Health Care Fund" and that "the purpose of the Fund is to support the operations of the [Maryland Medical Assistance] Program." 2006 Md. Law 1. This superficial characterization, however, does not determine the Act's actual purpose and effect; its content and context do. We conclude that the Fair Share Act cannot be properly characterized as a "tax" provision as that term is used in the Tax Injunction Act.

In sum, we hold that RILA has standing; that RILA's claim is ripe for adjudication; and that RILA's complaint is not barred by the Tax Injunction Act.

## III

On the merits of whether ERISA preempts the Fair Share Act, the Secretary contends that the district court misunderstood the nature and effect of the Fair Share Act, erroneously finding that the Act mandates an employer's provision of healthcare benefits and therefore "relates to" ERISA plans. The Secretary offers a different character-ization of the Fair Share Act — one with which ERISA is not con-cerned. He describes the Act as "part of the State's comprehensive scheme for planning, providing, and financing health care for its citi-zens." In his view, the Act imposes a payroll tax on covered employ-ers and offers them a credit against that tax for their healthcare spending. The revenue from this tax funds a Fair Share Health Care Fund, which is used to offset the costs of Maryland's Medical Assis-tance Program.

To resolve the question whether ERISA preempts the Fair Share Act, we consider first the scope of ERISA's preemption provision, 29 U.S.C. § 1144(a), and then the nature and effect of the Fair Share Act to determine whether it falls within the scope of ERISA's preemption.

## A

ERISA establishes comprehensive federal regulation of employers' provision of benefits to their employees. It does not mandate that employers provide specific employee benefits but leaves them free, "for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995). Instead, ERISA regulates the employee benefit plans that an employer chooses to establish, setting "various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983).

The vast majority of healthcare benefits that an employer extends to its employees qualify as an "employee welfare benefit plan," which ERISA defines broadly as:

> any *plan, fund, or program* which . . . was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . *medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability*, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . .

29 U.S.C. § 1002(1) (emphasis added). While an employer's one-time grant of some benefit that requires no administrative scheme does not constitute an ERISA "plan," a grant of a benefit that occurs periodically and requires the employer to maintain some ongoing administrative support generally constitutes a "plan." *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987) (finding that a one-time severance payment upon a plant closing did not constitute an ERISA "plan" because it did not require a "scheme" of ongoing administration); *Elmore v. Cone Mills Corp.*, 23 F.3d 855, 861 (4th Cir. 1994) (en banc) (explaining that even an employer's informal provision of benefits may be a "plan"); *cf. Massachusetts v. Morash*, 490 U.S. 107, 115-16 (1989) (finding that ordinary vacation benefits, paid out of an employer's general assets like wages rather than out of a dedicated fund, do not qualify as an "employee benefit plan"). Because the definition of an ERISA "plan" is so expansive, nearly any systematic provision of healthcare benefits to employees constitutes a plan.

The primary objective of ERISA was to "provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004); *see also Shaw*, 463 U.S. at 98-100 (reviewing the legislative history of ERISA's preemption provision). To accomplish this objective, § 514(a) of ERISA broadly preempts "any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a) (emphasis added). This preemption provision aims "to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government" and to reduce "the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990).

The language of ERISA's preemption provision — covering all laws that "relate to" an ERISA plan — is "clearly expansive." *Travelers*, 514 U.S. at 655. The Supreme Court has focused judicial analysis by explaining that a state law "relates to" an ERISA plan "if it has a *connection with* or *reference to* such a plan." *Shaw*, 463 U.S. at 97. But even these terms, "taken to extend to the furthest stretch of [their] indeterminacy," would have preemption "never run its course." *Travelers*, 514 U.S. at 655. Accordingly, we do not rely on "uncritical literalism" but attempt to ascertain whether Congress would have expected the Fair Share Act to be preempted. *See id.* at 656; *California Div. of Labor Standards Enforcement v. Dillingham Constr.*, 519 U.S. 316, 325 (1997). To make this determination, we look "to the objectives of the ERISA statute" as well as "to the nature of the effect of the state law on ERISA plans," *Dillingham*, 519 U.S. at 325, recognizing that ERISA is not presumed to supplant state law, especially in cases involving "fields of traditional state regulation," which include "the regulation of matters of health and safety," *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 n.8 (1997) (citation and quotation marks omitted).

Through application of these principles, the Supreme Court has held that not all state healthcare regulations are equal for purposes of ERISA preemption. States continue to enjoy wide latitude to regulate healthcare *providers*. *See, e.g.*, *De Buono*, 520 U.S. at 815-16 (upholding a state tax on gross receipts for patient services at hospitals, residential healthcare facilities, and diagnostic and treatment centers); *Travelers*, 514 U.S. at 658-59 (upholding a state mandate that hospitals charge certain insurers at higher rates than Blue Cross & Blue Shield). And ERISA explicitly saves state regulations of *insurance companies* from preemption. *See* 29 U.S.C. § 1144(b)(2)(A); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739-47 (1985). But unlike laws that regulate healthcare providers and insurance companies, "state laws that mandate[ ] employee benefit structures or their administration" are preempted by ERISA. *Travelers*, 514 U.S. at 658. Such state-imposed regulation of employers' provision of employee benefits conflict with ERISA's goal of establishing uniform, nationwide regulation of employee benefit plans. *Id.* at 657-58.

Thus, in *Shaw*, the Supreme Court held that ERISA preempted a New York law requiring employers to structure their employee bene-

fit plans to provide the same benefits for pregnancy-regulated disabilities as for other disabilities. 463 U.S. at 97. A multi-state employer could only comply with New York's mandate by varying its benefits for New York employees or by varying its benefits for all employees. *See Travelers*, 514 U.S. at 657 (construing *Shaw*). In either event, the New York law would interfere with the employer's ability to administer its ERISA plans uniformly on a nationwide basis. *Id.*

In line with *Shaw*, courts have readily and routinely found preemption of state laws that act directly upon an employee benefit plan or effectively require it to establish a particular ERISA-governed benefit. *See, e.g.*, *Metro. Life*, 471 U.S. at 739 (concluding that a Massachusetts law "related to" ERISA plans where it required an employer healthcare fund that provided hospital expense benefits also to cover mental health expenses); *American Med. Sec., Inc. v. Bartlett*, 111 F.3d 358, 360 (4th Cir. 1997) (striking down a Maryland statute that had the "purpose and effect" of "forc[ing] state-mandated health benefits on self-funded ERISA plans"). Likewise, *Shaw* dictates that ERISA preempt state laws that directly regulate employers' contributions to or structuring of their plans. *See, e.g.*, *Local Union 598 v. J.A. Jones Constr. Co.*, 846 F.2d 1213, 1218 (9th Cir. 1988), aff'd mem., 488 U.S. 881 (1988) (striking a state law that mandated minimum contributions to an apprenticeship training fund); *Stone & Webster Engineering Corp. v. Ilsley*, 690 F.2d 323, 328-29 (2d Cir. 1982), aff'd mem., 463 U.S. 1220 (1983) (striking a Connecticut law that required an employer to provide health and life insurance to a former employee receiving workers' compensation).

A state law that directly regulates the structuring or administration of an ERISA plan is not saved by inclusion of a means for opting out of its requirements. *See Egelhoff v. Egelhoff*, 532 U.S. 141, 150-51 (2001). In *Egelhoff*, the Court held that ERISA preempted a Washington statute that voided the designation of a spouse as a beneficiary of a nonprobate asset, including ERISA-governed life insurance policies. *Id.* at 142-43. Its effect was to require plan administrators to "pay benefits to the beneficiaries chosen by state laws, rather than to those identified in the plan documents." *Id.* at 147. Even though the statute permitted employers to opt out of the law with specific plan language, the Court struck the law down under ERISA's preemption provision because it still mandated that plan administrators "either follow

Washington's beneficiary designation scheme or alter the terms of their plans so as to indicate that they will not follow it." *Id.* at 150. Additionally, a proliferation of laws like Washington's would have undermined ERISA's objective of sparing plan administrators the task of monitoring the laws of all 50 States and modifying their plan documents accordingly. *Id.* at 150-51.

In sum, a state law has an impermissible "connection with"[2] an ERISA plan if it directly regulates or effectively mandates some element of the structure or administration of employers' ERISA plans. On the other hand, a state law that creates only indirect economic incentives that affect but do not bind the choices of employers or their ERISA plans is generally not preempted. *See Travelers*, 514 U.S. at 658. In deciding which of these principles is applicable, we assess the effect of a state law on the ability of ERISA plans to be administered uniformly nationwide. Even if a state law provides a route by which ERISA plans can avoid the state law's requirements, taking that route might still be too disruptive of uniform plan administration to avoid preemption. *See Egelhoff*, 532 U.S. at 151.

B

We now consider the nature and effect of the Fair Share Act to determine whether it falls within ERISA's preemption. At its heart,

---

[2]A state law is preempted also if it contains a "reference to" an ERISA plan, the alternative characterization referred to in *Shaw* for finding that it "relates to" an ERISA plan. *Shaw*, 463 U.S. at 97. The district court did not reach this issue because it found that preemption through the Fair Share Act's "connection with" ERISA plans. Because of our ruling in this opinion, we likewise do not reach the question. But we note that this standard applies more narrowly to preempt state law, examining the text of the statute to determine whether its own terms bring ERISA plans under its operation. *See Dillingham*, 519 U.S. at 325 (explaining that a state law contains a "reference to" an ERISA plan if it "acts immediately and exclusively upon ERISA plans" or if "the existence of ERISA plans is essential to the law's operation"); *see also District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 128 (1992) (invalidating a law that required an employer "who provides health insurance coverage for an employee" to provide the equivalent insurance while the employee was receiving workers compensation benefits).

the Fair Share Act requires every employer of 10,000 or more Maryland employees to pay to the State an amount that equals the difference between what the employer spends on "health insurance costs" (which includes any costs "to provide health benefits") and 8% of its payroll. Md. Code Ann., Lab. & Empl. §§ 8.5-101, 8.5-104. As Wal-Mart noted by way of affidavit, it would not pay the State a sum of money that it could instead spend on its employees' healthcare. This would be the decision of any reasonable employer. Healthcare benefits are a part of the total package of employee compensation an employer gives in consideration for an employee's services. An employer would gain from increasing the compensation it offers employees through improved retention and performance of present employees and the ability to attract more and better new employees. In contrast, an employer would gain nothing in consideration of paying a greater sum of money to the State. Indeed, it might suffer from lower employee morale and increased public condemnation.

In effect, the only rational choice employers have under the Fair Share Act is to structure their ERISA healthcare benefit plans so as to meet the minimum spending threshold.[3] The Act thus falls squarely under *Shaw*'s prohibition of state mandates on how employers structure their ERISA plans. *See Shaw*, 463 U.S. at 96-97. Because the Fair Share Act effectively mandates that employers structure their employee healthcare plans to provide a certain level of benefits, the Act has an obvious "connection with" employee benefit plans and so is preempted by ERISA.

This view of the Fair Share Act is reinforced by the position of the State of Maryland itself. The Maryland General Assembly intended the Act to have precisely this effect. As we noted in Part I, the context for enactment of the Act, including the Department of Legislative

---

[3]Theoretically, a covered employer whose healthcare spending for employees falls short of the 8% minimum could, by other steps, avoid regulation without restructuring or altering the administration of its ERISA plans. It could move plants from the State to bring its employee number under 10,000; it could reduce wages to increase the proportion of its payroll devoted to healthcare spending; it could violate the Act and incur a civil penalty; or it could leave the State altogether. But not even the Secretary advances these arguments.

Services' official description of it, shows that legislators and interested parties uniformly understood the Act as *requiring* Wal-Mart to increase its healthcare spending. If this is not the Act's effect, one would have to conclude, which we do not, that the Maryland legislature misunderstood the nature of the bill that it carefully drafted and debated. For these reasons, the amount that the Act prescribes for payment to the State is actually a fee or a penalty that gives the employer an irresistible incentive to provide its employees with a greater level of health benefits.

It is a stretch to claim, as the Secretary does, that the Fair Share Act is a revenue statute of general application. When it was enacted, the General Assembly knew that it applied, and indeed intended that it apply, to one employer in Maryland — Wal-Mart. The General Assembly designed the statute to avoid applying the 8% level to Johns Hopkins University; it knew that Giant Food was unionized and already was providing more than 8%; and it amended the statute to avoid including Northrop Grumman. Even as the statute is written, the category of employers employing 10,000 employees in Maryland includes only four persons in Maryland and therefore could hardly be intended to function as a revenue act of general application.

While the Secretary argues that the Fair Share Act is designed to collect funds for medical care under the Maryland Medical Assistance Program, the core provision of the Act aims at requiring covered employers to provide medical benefits to employees. The effect of this provision will force employers to structure their recordkeeping and healthcare benefit spending to comply with the Fair Share Act. Functioning in that manner, the Act would disrupt employers' uniform administration of employee benefit plans on a nationwide basis. As Wal-Mart officials averred, Wal-Mart does not presently allocate its contributions to ERISA plans or other healthcare spending by State, and so the Fair Share Act would require it to segregate a separate pool of expenditures for Maryland employees.

This problem would not likely be confined to Maryland. As a result of similar efforts elsewhere to pressure Wal-Mart to increase its healthcare spending, other States and local governments have adopted or are considering healthcare spending mandates that would clash with the Fair Share Act. For example, two New York counties

recently adopted provisions to require Wal-Mart to spend an amount on healthcare to be determined annually by an administrative agency. *See* N.Y.C. Admin. Code § 22-506(c)(2); Suffolk County, N.Y., Reg. Local Laws § 325-3. Similar legislation under consideration in Minnesota calculates total wages, from which an employer's minimum spending level is determined, with reference to Minnesota's median household income. *See* H.F. 3143, 84th Leg. Sess. (Minn. 2006). If permitted to stand, these laws would force Wal-Mart to tailor its healthcare benefit plans to each specific State, and even to specific cities and counties. This is precisely the regulatory balkanization that Congress sought to avoid by enacting ERISA's preemption provision. *See Shaw*, 463 U.S. at 98-100.

The Secretary argues that the Act is not mandatory and therefore does not, for preemption purposes, have a "connection with" employee benefit plans because it gives employers two options to avoid increasing benefits to employees. An employer can, under the Fair Share Act, (1) increase healthcare spending on employees in ways that do not qualify as ERISA plans; or (2) refuse to increase benefits to employees and pay the State the amount by which the employer's spending falls short of 8%. Because employers have these choices, the Secretary argues, the Fair Share Act does not preclude Wal-Mart from continuing its uniform administration of ERISA plans nationwide. He maintains that the Fair Share Act is more akin to the laws upheld in *Travelers*, 514 U.S. at 658-59, and *Dillingham*, 519 U.S. at 319, which merely created economic incentives that affected employers' choices while not effectively dictating their choice. This argument fails for several reasons.

First, the laws involved in *Travelers* and *Dillingham* are inapposite because they dealt with regulations that only *indirectly* regulated ERISA plans. In *Travelers*, a New York law required hospitals to add a surcharge to the fees they demanded from most insurance companies, but the law exempted Blue Cross and Blue Shield from having to pay the surcharge. *Travelers*, 514 U.S. at 658-59. The effect of the law was to make Blue Cross and Blue Shield a cheaper and more attractive option for ERISA-covered healthcare plans to purchase. The Supreme Court upheld the law because it did not act *directly upon employers or their plans* but merely created "an indirect economic influence" on plans. *Id.* at 659. The New York law did not

"bind plan administrators to any particular choice." *Id.* Nor did this incentive to choose Blue Cross/Blue Shield "preclude uniform administrative practice" on a nationwide basis. *Id.* The Court acknowledged, however, that a state law could produce such "acute, albeit indirect, economic effects . . . as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers" and therefore be preempted by ERISA. *Id.* at 668. In short, while the state law in *Travelers* directly regulated *hospitals*' charges to insurance companies, it only *indirectly* affected the prices ERISA plans would pay for insurance policies.

Likewise, in *Dillingham*, a California law directly regulated wages that contractors paid to apprentices on public construction projects, which only indirectly affected ERISA-covered apprenticeship programs' incentives to obtain state certification. 519 U.S. at 332-34. The law permitted contractors to pay apprentices a lower-than-prevailing wage if the apprentices participated in a state-certified apprentice program. *Id.* at 319-20. The effect of the law was to create an *indirect* incentive for ERISA-governed programs to obtain state certification. *Id.* at 332-33. This incentive, the Court concluded, was not so strong that it effectively eliminated the programs' choice as to whether to seek state certification. *Id.* Noncertified apprentice programs were still free to supply apprentices for private projects at no disadvantage and to supply apprentices for public projects with just a slight disadvantage. *Id.* at 332. Accordingly, the Court upheld the prevailing wage law as more akin to the law in *Travelers* than to the law in *Shaw*. *Id.* at 334.

In contrast, to *Travelers* and *Dillingham*, the Fair Share Act *directly* regulates employers' structuring of their employee health benefit plans. This tighter causal link between the regulation and employers' ERISA plans makes the Fair Share Act much more analogous to the regulations at issue in *Shaw* and *Egelhoff*, both of which were found to be preempted by ERISA.

Second, the choices given in the Fair Share Act, on which the Secretary relies to argue that the Act is not a mandate on employers, are not meaningful alternatives by which an employer can increase its healthcare spending to comply with the Fair Share Act without affecting its ERISA plans. It is true that an employer could maintain on-site

medical clinics, the expenditures for which would qualify as "health insurance costs" under the Fair Share Act because they are deductible under § 213(d) of the Internal Revenue Code. 26 U.S.C. § 213(d); Md. Code Ann., Lab. & Empl. § 8.5-101. At the same time, such expenditures would not amount to the establishment of an "employee welfare benefit plan" under ERISA. *See* 29 C.F.R. § 2510.3-1(c)(2). The ERISA regulation, however, defines non-ERISA clinics quite narrowly as "the maintenance on the premises of an employer of facilities for the treatment of minor injuries or illness or rendering first aid in case of accidents occurring during working hours." *Id.* And the Department of Labor strictly interprets the regulation not to cover a facility that treats members of employees' families or more than "minor injuries." *See* Labor Dep't Op. No. 83-35A, 1983 WL 22520 (1983). Thus, qualifying clinics could not provide more than simple, circumscribed care that would not involve substantial expenditures. They simply would not be a serious means by which employers could increase healthcare spending to comply with the Fair Share Act.

In addition to on-site medical clinics, employers could, under the Fair Share Act, contribute to employees' Health Savings Accounts as a means of non-ERISA healthcare spending. Under federal tax law, eligible individuals may establish and make pretax contributions to a Health Savings Account and then use those monies to pay or reimburse medical expenses. *See* 26 U.S.C. § 223. Employers' contributions to employees' Health Savings Accounts qualify as healthcare spending for purposes of the Fair Share Act. *See* Md. Code Ann., Lab. & Empl. § 8.5-101(d)(2). This option of contributing to Health Savings Accounts, however, is available under only limited conditions, which undermine the impact of this option. For example, only if an individual is covered under a high deductible health plan and no other more comprehensive health plan is he eligible to establish a Health Savings Account. *See* 26 U.S.C. § 223(c)(1). This undoubtedly reduces greatly the pool of Wal-Mart employees who would be eligible to establish Health Savings Accounts. In addition, for an employer's contribution to a Health Savings Account to be exempt from ERISA, the Health Savings Account must be established voluntarily by the employee. *See* U.S. Dep't of Labor, Employee Benefits Sec. Admin., Field Assistance Bulletin 2004-1. This would likely shrink further the potential for Health Savings Accounts contributions as

many employees would not undertake to establish Health Savings Accounts.

More importantly, even if on-site medical clinics and contributions to Health Savings Accounts were a meaningful avenue by which Wal-Mart could incur non-ERISA healthcare spending, we would still conclude that the Fair Share Act had an impermissible "connection with" ERISA plans. The undeniable fact is that the vast majority of any employer's healthcare spending occurs through ERISA plans. Thus, the primary subjects of the Fair Share Act are ERISA plans, and any attempt to comply with the Act would have direct effects on the employer's ERISA plans. If Wal-Mart were to attempt to utilize non-ERISA health spending options to satisfy the Fair Share Act, it would need to coordinate those spending efforts with its existing ERISA plans. For example, an individual would be eligible to establish a Health Savings Account only if he is enrolled in a high deductible health plan. *See* 29 U.S.C. § 223(c)(1). In order for Wal-Mart to make widespread contributions to Health Savings Accounts, it would have to alter its package of ERISA health insurance plans to encourage its employees to enroll in one of its high deductible health plans. From the employer's perspective, the categories of ERISA and non-ERISA healthcare spending would not be isolated, unrelated costs. Decisions regarding one would affect the other and thereby violate ERISA's preemption provision.

Further, the Fair Share Act and a proliferation of similar laws in other jurisdictions would force Wal-Mart or any employer like it to monitor these varying laws and manipulate its healthcare spending to comply with them, whether by increasing contributions to its ERISA plans or navigating the narrow regulatory channel between the Fair Share Act's definition of healthcare spending and ERISA's definition of an employee benefit plan. In this way, the Fair Share Act is directly analogous to the Washington State statute in *Egelhoff*, 532 U.S. at 147-48, that revoked a spouse's beneficiary designation upon divorce. Even though the Washington statute included an opt-out provision, the Court held the law to be preempted because it required plan administrators to "maintain a familiarity with the laws of all 50 States so that they can update their plans as necessary to satisfy the opt-out requirements of other, similar statutes." *Id.* at 151. The Fair Share Act likewise would deny Wal-Mart the uniform nationwide administration

of its healthcare plans by requiring it to keep an eye on conflicting state and local minimum spending requirements and adjust its healthcare spending accordingly.

Perhaps recognizing the insufficiency of a non-ERISA healthcare spending option, the Secretary relies most heavily on its argument that the Fair Share Act gives employers the choice of paying the State rather than altering their healthcare spending. The Secretary contends that, in certain circumstances, it would be rational for an employer to choose to do so. It conceives that an employer, whose healthcare spending comes close to the 8% threshold, may find it more cost-effective to pay the State the required amount rather than incur the costs of altering the administration of its healthcare plans. The existence of this stylized scenario, however, does nothing to refute the fact that in *most* scenarios, the Act would cause an employer to alter the administration of its healthcare plans. Indeed, identifying the narrow conditions under which the Act would not force an employer to increase its spending on healthcare plans only reinforces the conclusion that the overwhelming effect of the Act is to mandate spending increases. This conclusion is further supported by the fact that Wal-Mart representatives averred that Wal-Mart would in fact increase healthcare spending rather than pay the State.

In short, the Fair Share Act leaves employers no reasonable choices except to change how they structure their employee benefit plans.

Because the Act directly regulates employers' provision of healthcare benefits, it has a "connection with" covered employers' ERISA plans and accordingly is preempted by ERISA.

IV

On its cross-appeal, RILA contends that the district court erred in finding that the Fair Share Act does not violate the Equal Protection Clause. Because we have concluded that the Fair Share Act is preempted by ERISA, we need not consider RILA's equal-protection claim.

V

The Maryland General Assembly, in furtherance of its effort to require Wal-Mart to spend more money on employee health benefits

and thus reduce Wal-Mart's employees' reliance on Medicaid, enacted the Fair Share Act. Not disguised was Maryland's purpose to require Wal-Mart to change, at least in Maryland, its employee benefit plans and how they are administered. This goal, however, directly clashes with ERISA's preemption provision and ERISA's purpose of authorizing Wal-Mart and others like it to provide uniform health benefits to its employees on a nationwide basis.

Were we to approve Maryland's enactment solely for its noble purpose, we would be leading a charge against the foundational policy of ERISA, and surely other States and local governments would follow. As sensitive as we are to the right of Maryland and other States to enact laws of their own choosing, we are also bound to enforce ERISA as the "supreme Law of the Land." U.S. Const. art. VI.

The judgment of the district court is

*AFFIRMED*.

MICHAEL, Circuit Judge, dissenting:

Maryland, like most states, is wrestling with explosive growth in the cost of Medicaid. Innovative ideas for solving the funding crisis are required, and the federal government, as the co-sponsor of Medicaid, has consistently called upon the states to function as laboratories for developing workable solutions. In response to this call and its own funding predicament, Maryland enacted the Fair Share Health Care Fund Act (Maryland Act or Act) in 2006 to require very large employers, such as Wal-Mart Stores, Inc., to assume greater responsibility for employee health insurance costs that are now shunted to Medicaid. I respectfully dissent from the majority's opinion that the Maryland Act is preempted by ERISA. The Act offers a covered employer the option to pay an assessment into a state fund that will support Maryland's Medicaid program. Thus, the Act offers a means of compliance that does not impact ERISA plans, and it is not preempted.

I.

"Medicaid is a means-tested entitlement program financed by the states and federal government" that provides medical care for about

60 million Americans, a number made up of low-income adults and their dependent children. Nat'l Governors Ass'n & Nat'l Ass'n of State Budget Officers, *The Fiscal Survey of States* 4 (2006). Medicaid was originally intended to provide help to the most vulnerable rather than to a broader population of the working poor and their families. In short, Congress intended for the Medicaid program to serve only as the "payer of last resort." *See* S. Rep. No. 99-146, at 312-13 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 42, 279-80. Over time, however, Medicaid has become the payer of first resort for a large percentage of patients. In 2006 state and federal Medicaid spending totaled an estimated $320 billion. Medicaid — the fastest-growing expense for many states — dominates the state budgeting process around the country. Program expenditures currently make up about twenty-two percent of total state spending annually, and these outlays are projected to grow at a rate of eight percent over the next decade. Already, between one-quarter and one-third of the states have experienced significant shortfalls in their annual Medicaid appropriations, suggesting that those with lower incomes are being pushed to Medicaid at an unexpected (and alarming) rate.

The increase in Medicaid spending is caused in part by the decline in employer-sponsored health insurance. In Maryland's words, Medicaid "has been transformed into a corporate subsidy, with taxpayer-funded employee health care an integral component of [many] an employer's benefits program." Reply Br. of Appellant at 4. Wal-Mart, which is subject to the Maryland Act, is cited as a company that abuses the Medicaid program. "Wal-Mart has more employees and dependents on subsidized Medicaid or similar programs than any other company nationwide." J.A. 321. A Georgia survey "found that more than 10,000 children of Wal-Mart employees were enrolled in the state's children's health insurance program . . . at a cost of nearly $10 million annually." J.A. 89. Similarly, a study by a North Carolina hospital found that thirty-one percent of Wal-Mart employees were enrolled in Medicaid and an additional sixteen percent were uninsured. In an internal company memo of fairly recent origin, Wal-Mart acknowledged that "[t]wenty-seven percent of [its employees'] children are on [Medicaid]," and an additional nineteen percent are uninsured. J.A. 321.

## II.

Maryland has its own Medicaid funding crisis. The state's Medical Assistance (Medicaid and children's health) Program now consumes about seventeen percent of the state general fund, and it is one of the fastest growing components of the budget. Maryland's 2007 Medical Assistance expenditures are expected to total $4.7 billion. Over the next five years the state's Medicaid costs are projected to grow at a rate that exceeds growth in general fund revenues by about three percent. Increasing enrollment in the program is a contributing factor. Enrollment growth is being spurred by the continuing rise in the number of children qualifying for Medicaid due to low family income. As employers drop or fail to offer affordable family health care coverage, more and more children of low income employees are forced into Medicaid or other taxpayer-funded insurance. Rising health care costs and the increase in the number of uninsured residents of all ages are also factors that accelerate the growth in Maryland's Medicaid budget. Even though many of the uninsured may not qualify for Medicaid, they nevertheless drive up Medicaid costs under Maryland's "all-payor" system. The all-payor system requires those who pay their hospital bills in Maryland to subsidize the cost of hospital care rendered to uninsured patients. The costs of treating those who cannot pay are added into the state-approved rates charged to those who can pay through insurance or other means. *See* Md. Code Ann. Health-Gen. §§ 19-211, 214, 219. The all-payor rates rise as the number of uninsured persons increases. Medicaid, as a significant purchaser of medical care in Maryland, is thus forced to bear an ever greater burden as the number of patients without employer-backed health insurance increases.

Maryland's annual Medicaid obligations are exceeding legislative appropriations by enormous sums. The shortfall in 2006 was estimated to be around $130 million. The state has made up the deficit in part by transferring money from other programs. Such stopgap measures, however, are becoming less sustainable with each passing month. To deal with the crisis, Maryland, like many other states, has sought new ways to constrain health care costs and generate additional revenue for its Medicaid program.

The Maryland Act is part of the state's effort to deal with the mounting funding pressures. The Act establishes the Fair Share

Health Care Fund to "support the operations of the [Maryland Medical Assistance] Program." Md. Code Ann. Health-Gen. § 15-142(c). The fund will receive revenue from assessments on large employers that fail to meet the Act's spending requirements for health insurance. *Id.* § 15-142(e). The Act requires each employer with 10,000 or more employees in Maryland to submit an annual report specifying its Maryland employee number, the amount it spent on health insurance in Maryland, and the percentage of payroll it spent on health insurance in the state. Md. Code Ann. Lab. & Empl. § 8.5-103. Currently, four employers in Maryland are subject to the Act. A for-profit employer, of which there are three, must spend eight percent or more of total wages on health insurance or pay the difference to the Secretary of Labor, Licensing, and Regulation. *Id.* § 8.5-104(b). Health insurance costs include all tax deductible spending on employee health insurance or health care allowed by the Internal Revenue Code. *Id.* § 8.5-101(d). Nothing in the Act demonstrates an intent to restrict its application solely to Wal-Mart.

The Act instructs the Secretary to place any revenue collected in a special fund to defray the costs of Maryland's Medicaid program. Md. Code Ann. Health-Gen. § 15-142. In this way, the Act will support the state's Medical Assistance Program either by directly defraying Medicaid costs or by prompting covered employers to spend more on employee health insurance.

III.

I agree with the majority that the claims asserted by the Retail Industry Leaders Association (RILA) are justiciable, but not for all of the same reasons. RILA has associational standing to sue because it alleges that one of its members, Wal-Mart, faces the imminent injury of being forced to comply with the Act's reporting requirements and either to pay an assessment or to increase its spending on employee health insurance. This allegation is sufficient to satisfy the injury element necessary for standing. There is thus no need to rely on RILA's argument that the Act will injure Wal-Mart by impeding its ability to administer its employee benefit plans in a uniform fashion. The Act will not cause such an injury, as I explain later on.

My conclusion that this action is not barred by the Tax Injunction Act also rests on different reasons. The majority is wrong to charac-

terize the Act's stated revenue raising purpose as superficial. The Act legitimately anticipates a potential revenue stream, despite making available an alternative mode of compliance that does not generate revenue. The Act's revenue raising component is directly connected to the regulatory purpose of assessing employers that rely disproportionately on state-subsidized programs to provide health care for their employees.

"To determine whether a particular charge is a 'fee' or a 'tax,' the general inquiry is to assess whether the charge is for revenue raising purposes, making it a 'tax,' or for regulatory or punitive purposes, making it a 'fee.'" *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000). An assessment is more likely to be a fee than a tax if it is imposed by an administrative agency, it is aimed at a small group rather than the public at large, and any revenue collected is placed in a special fund dedicated to the purposes of the regulation. *Collins Holding Corp. v. Jasper County*, 123 F.3d 797, 800 (4th Cir. 1997).

In this case the Act was passed by the legislature and has revenue raising potential. Other indicators suggest, however, that the Act's assessment scheme is more in the nature of a regulatory fee than a tax. The Act applies to a very small group — only four employers. The assessment may generate revenue, but its primary purpose is punitive in nature. It assesses employers that provide substandard health benefits or none at all. Any revenue collected serves to recoup costs incurred by the state due to such behavior; collections are not deposited in the general fund. The regulatory purpose is further evidenced by the Act's creation of a special fund administered by the Secretary of Labor, Licensing, and Regulation and dedicated to defraying the state's Medicaid costs. These characteristics show the significant differences between the assessment imposed by the Act and a typical tax imposed on a large segment of the population and used to benefit the general public. *See Valero*, 205 F.3d at 135. Because the assessment is not a tax, I therefore agree with the majority's ultimate conclusion that the Tax Injunction Act does not deprive the federal courts of jurisdiction to consider this case.

## IV.

I respectfully dissent on the issue of ERISA preemption because the Act does not force a covered employer to make a choice that

impacts an employee benefit plan. An employer can comply with the Act either by paying assessments into the special fund or by increasing spending on employee health insurance. The Act expresses no preference for one method of Medicaid support or the other. As a result, the Act is not preempted by ERISA.

ERISA supersedes "any and all State laws insofar as they . . . relate to any employee benefit plan." 29 U.S.C. § 1144(a). State laws "relate to" ERISA plans if they have a "connection with" or make "reference to" such plans. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983). The Maryland Act does neither.

A state statute has an impermissible connection with an ERISA plan when it requires the establishment of a plan, mandates particular employee benefits, or impacts plan administration. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 14 (1987) (state can require one-time, lump sum severance payments because they would not require the establishment or maintenance of a plan); *Egelhoff v. Egelhoff*, 532 U.S. 141, 147-50 (2001) (state cannot automatically revoke a beneficiary designation of an ex-spouse in a plan policy); *Shaw*, 463 U.S. at 97, 100 (state cannot require ERISA plans to cover pregnancy). The Act offers a compliance option that does not require an employer to maintain an ERISA plan, administer plans according to state-prescribed rules, or offer a certain level of ERISA benefits. Also, the Act does not contain an impermissible reference to ERISA plans. It allows an employer to maintain a uniform national plan, albeit at a cost. It is thus not the sort of law that Congress intended to preempt. Indeed, the Act is a legitimate response to congressional expectations that states develop creative ways to deal with the Medicaid funding problem.

## A.

The Act does not compel an employer to establish or maintain an ERISA plan in order to comply with its provisions. ERISA plan expenditures are considered in the calculation of an employer's total level of health insurance spending, but this factor does not create an impermissible connection with an ERISA plan. *See Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor*, 107 F.3d 1000, 1009 (2d Cir. 1997); *Keystone Chapter, Associated Builders & Contractors,*

*Inc. v. Foley*, 37 F.3d 945, 961 (3d Cir. 1994). The Act offers a compliance option that is not predicated on the existence of an ERISA plan. Again, an employer may comply by paying an assessment into Maryland's Fair Share Health Care Fund.

## B.

The Act does not impede an employer's ability to administer its ERISA plans under nationally uniform provisions. A problem would arise if the Act dictated a plan's system for processing claims, paying benefits, or determining beneficiaries. *See Egelhoff*, 532 U.S. at 147, 150. But the Act does none of those things. The only aspect of the Act that might impact plan administration is the requirement for reporting data about Maryland employee numbers, payroll, and ERISA plan spending. However, any burden this requirement puts on plan administration is simply too slight to trigger ERISA preemption. *See Foley*, 37 F.3d at 963 (requiring employers to record benefits contributions will not influence decisions about the structure of ERISA plans and so will not impede the administration of nationwide plans); *see also Minn. Chapter of Associated Builders & Contractors, Inc. v. Minn. Dep't of Labor & Industry*, 866 F. Supp. 1244, 1247 (D. Minn. 1993) ("The requirement of calculating [the cost of benefits] falls on the employer itself, but does not place any administrative burden on the plan. The requirements of calculating costs and keeping records may somewhat increase the cost of the benefits plans, but this incidental impact on the plans need not lead to preemption.").

## C.

The Act does not mandate a certain level of ERISA benefits. A statute that "alters the incentives, but does not dictate the choices, facing ERISA plans" is not preempted. *Calif. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 334 (1997). The ERISA preemption provision allows for uniformity of administration and coverage, but "cost uniformity was almost certainly not an object of pre-emption." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 662 (1995).

Under the Act employers have the option of either paying an assessment or increasing ERISA plan health insurance. This choice is

real. The assessment does not amount to an exorbitant fee that leaves a large employer with no choice but to alter its ERISA plan offerings. *See id.* at 664. According to Wal-Mart estimates, the company faces, at most, a potential assessment of one percent of its Maryland payroll. Paying the assessment would thus not be a financial burden that leaves Wal-Mart with a Hobson's choice, that is, no real choice but to increase health insurance benefits. Wal-Mart contends that it would never choose to pay the assessment when given the option of gaining employee goodwill through increased benefits. To begin with, Wal-Mart's bald claim that it would increase benefits appears dubious. Wal-Mart has not seen fit thus far to use comprehensive health insurance as a means of generating employee goodwill. More important, Wal-Mart's claim that it would increase benefits rather than pay the fee is irrelevant because the choice to increase benefits is not compelled by the Act. That choice would simply be a business judgment that Wal-Mart is free to make. Indeed, an employer close to the required statutory percentage, such as Wal-Mart, may find it easier to pay the assessment than to increase health insurance spending. So long as the assessment is not so high as to make its selection financially untenable, an employer may freely evaluate whether the ability to maintain current levels of health insurance spending is worth the price of the assessment.

The majority attempts to distinguish *Travelers* and *Dillingham* by contrasting the indirect regulation of ERISA plans in those cases with what it deems a direct regulation here. I disagree with the majority's assertion that the Maryland Act directly regulates ERISA plans. "Where a legal requirement may be easily satisfied through means unconnected to ERISA plans, and only relates to ERISA plans at the election of an employer, it 'affect[s] employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law "relates to" the plan.'" *Foley*, 37 F.3d at 960 (quoting *Shaw*, 463 U.S. at 100 n. 21). Moreover, *Travelers* and *Dillingham* focused not on nebulous distinctions between direct and indirect effects, but on establishing a general rule for ERISA preemption that "look[s] *both* to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive as well as to the nature of the effect of the state law on ERISA plans." *Dillingham*, 519 U.S. at 325 (emphasis added) (quotation marks and citations omitted). The statutes in *Travelers* and *Dillingham* were permissible regulations

of ERISA plans primarily because they did not mandate a particular level of benefits or impact plan administration, not because of the non-ERISA targets of the regulations. *See Travelers*, 514 U.S. at 664; *Dillingham*, 519 U.S. at 332-33.

We must similarly focus our inquiry on any threat the Maryland Act poses to the purposes of the ERISA preemption provision rather than on hazy distinctions between direct and indirect regulations. *See Travelers*, 514 U.S. at 656. Congress generally does not intend to preempt acts in traditional areas of state regulation, such as health and safety. *De Buono v. NYSA-ILA Medical & Clinical Servs. Fund*, 520 U.S. 806, 813-14 (1997). The purpose of the Act, to relieve state Medicaid burdens and improve health care for low income residents, falls into this category. *Travelers* and *Dillingham* demonstrate that so long as the regulation impacts a traditional area of state concern, and employers are left with an effective choice that avoids ERISA implications, the regulation may stand.

Rather than fitting within the ERISA preemption target, the Maryland Act is in line with Congress's intention that states find innovative ways to solve the Medicaid funding crisis. Congress already directs states to "take all reasonable measures to ascertain the legal liability of [and to seek reimbursement from] third parties (including health insurers . . . or other parties that are, by statute, contract, or agreement, legally responsible for payment of a claim for a health care item or service) to pay for care and services available under [Medicaid]." 42 U.S.C. §§ 1396a(a)(25)(A) & (B). I recognize, of course, that the Maryland Act goes beyond this basic directive, but it is nevertheless a legitimate response to the consistent encouragement Congress has given to the states to find "novel approaches" and to "develop innovative and effective solutions" to deal with the worsening Medicaid funding problem. S. Rep. No. 99-146, at 462 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 42, 421 (remarks of Sen. Orrin G. Hatch); *see also Travelers*, 514 U.S. at 665 (recognizing that Congress has "sought to encourage . . . state responses to growing health care costs and the widely diverging availability of health services").

D.

The Act also contains no impermissible reference to an ERISA plan. Such a reference occurs only when a statute explicitly refers to

or relies upon the existence of an ERISA plan. *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 (1992) (statute pre-empted because it applied to "health insurance coverage," which is an ERISA plan). Obligations under the Act are tied to a covered employer's level of tax deductible health insurance spending. The Act does not make any explicit statement about ERISA plans or rely on their existence.

### E.

As the record makes clear, Maryland is being buffeted by escalating Medicaid costs. The Act is a permissible response to the problem. Because a covered employer has the option to comply with the Act by paying an assessment — a means that is not connected to an ERISA plan — I would hold that the Act is not preempted.